Filed 10/7/13  P. v. Keigwin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061251 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD227925) |
| KENT THOMAS KEIGWIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed with directions.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Kent Thomas Keigwin was charged in count 1 of the

amended information with the first degree murder of John Watson (victim) (Pen. Code, § 187, subd. (a)).[1] As a special circumstance, it was further alleged Keigwin committed the murder for financial gain and during the course of a robbery (§ 190.2, subd. (a)(1), (17)).[2]

Keigwin was charged in count 2 of using the personal identifying information of the victim for the purpose of theft (§ 530.5, subd. (a)); in count 3 of stealing money and personal property from the victim in excess of $400 (§ 487, subd. (a));[3] in count 4 of burglary for entering a building occupied by an investment firm with the intent to commit theft (§ 459); in count 5 of forgery (§ 470, subd. (d)) and committing two or more related felonies, a material element of which is fraud and embezzlement that involved the taking of more than $100,000 (§ 186.11, subd. (a)(3)); and in count 6 of using the personal identifying information of another for the purpose of committing a fraud (§ 530.5, subd. (a)).

As to all counts, it was further alleged Keigwin took money and property of another of more than $100,000 (§ 1203.045, subd. (a)); committed two or more felonies that involved the taking of more than $500,000 (§ 186.11, subd. (a)(2)); and in the

---

[1]     All further statutory references are to the Penal Code.

[2]     Although special circumstances were alleged against Keigwin and found true by the jury, the case was not tried as a capital case.

[3]     After the evidence was heard, the record shows count 3 was amended to attempted grand theft.  (§§ 664, 487, subd. (a).)

commission or attempted commission of the offenses alleged, the aggregate losses to the victims from all charges exceeded $3.2 million (§ 12022.6, subd. (a)(4)).

The jury found Keigwin guilty as charged and found true the allegations and special circumstances. The court sentenced Keigwin on count 1 to life in prison without the possibility of parole and stayed sentence on counts 2 through 6 pursuant to section 654. The court also imposed pursuant to section 1202.45 a parole revocation fine of $10,000 and stayed that fine.

On appeal, Keigwin contends the court that presided over his preliminary hearing and his first motion to suppress evidence allegedly found his arrest was illegal based on a lack of probable cause by the arresting officers and, as such, further contends certain additional evidence that came to light in connection with his arrest should have been excluded in his second motion to suppress evidence, which he filed about nine months later.

Keigwin also contends his motions to traverse the search warrants were improperly denied because they were tainted by evidence seized as a result of the unlawful search before his arrest and by his subsequent illegal arrest, and because the affidavits in support of the search warrants allegedly contained material misstatements and/or omissions. Keigwin thus seeks reversal of his conviction and a new trial ordered, with instructions to grant his second motion to suppress and his motions to traverse the search warrants.

Keigwin alternatively contends that the $10,000 parole revocation fine imposed

under section 1202.45 and stayed by the court must be stricken from the abstract of judgment because he received a life sentence without the possibility of parole.

As we explain, we conclude the court did not err when it denied Keigwin's second motion to suppress and his motions to traverse the search warrants. However, we agree with Keigwin that his stayed restitution fine should be stricken from the abstract of judgment because he is serving a life sentence without the possibility of parole.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

The victim was a wealthy executive who had recently retired and moved to San Diego. Jillian Ison was the victim's older sister. Both the victim and his sister were English. Ison testified the victim worked both in Europe and in the United States. The last time she saw her brother alive had been in 2009 when she, along with her husband, skied with the victim in Switzerland. Prior to the ski trip, the victim told Ison he had invited a friend to join them on the trip. That friend was Keigwin, an investment advisor who at one point managed some of the victim's investments. Ison had never met Keigwin before the ski trip but testified her brother may have mentioned Keigwin in one of his emails.

Ison testified Keigwin and his adult daughter went on the ski trip. During their first meeting, while going up the mountain in a train, Keigwin told what Ison described as "quite lurid jokes" that embarrassed her brother. According to Ison, the victim became

---

[4]     We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by Keigwin are discussed *post*.

further embarrassed by Keigwin when it became obvious that Keigwin was a poor skier, which also upset the victim because Keigwin previously had told the victim he had been a ski instructor and was a "king skier." A few days later, Keigwin and his daughter left. Ison testified the ski trip soured the relationship between her brother and Keigwin, and her brother then decided Keigwin would no longer help with any of his investments.

Anna Marie Sorriso testified she met the victim in early 2008 as they were both members of a ski club. Sorriso became friends with the victim. They skied together and, when it was not ski season, they met for lunch, hiked and socialized. Keigwin also was a member of the same ski club. The victim introduced Keigwin to Sorriso at a ski club event. Sorriso testified she and other ski club members, including Keigwin and the victim, went on hikes and, on one occasion, Sorriso went sailing with the victim and Keigwin on Keigwin's sailboat. Sorriso testified at some point the victim told her he had some financial investments with Keigwin.

Sorriso testified the victim regularly sent "fun and interesting" emails to four people that included her and Keigwin. At some point, Sorriso noticed Keigwin was no longer on the distribution list of these emails. The victim told Sorriso he became disenchanted with Keigwin after their ski trip because Keigwin had lied when he told the victim he was a good skier and had embarrassed the victim in front of his family. Sorriso testified the victim was "very" upset with Keigwin. However, according to Sorriso, the victim was still friendly with Keigwin. Shortly thereafter, the victim told Sorriso he and Keigwin were no longer friends because the victim did not believe Keigwin was honest.

5

The victim subsequently referred to Keigwin as a "turd" and "turdball" and told Sorriso he did not want to have any more dealings with Keigwin. The victim also told Sorriso that Keigwin was in "dire financial [straits]."

Dr. Barry Kassar, a retired ophthalmologist, became acquainted with the victim through an organization comprised of mostly retired senior professionals and business people that helped mentor and fund young, start-up businesses and entrepreneurs. Kassar testified the victim did not attend the June 8, 2010 regularly-scheduled monthly dinner meeting of the organization. Kassar was surprised the victim was not at the meeting because the victim was the chairperson of that particular meeting, which meant the victim had to prepare an educational session, arrange presentations by one or more companies seeking the help of the organization and run the meeting. Kassar became even more concerned when he learned that the victim also had not attended the board meeting of the organization that took place two hours before the dinner meeting.

Kassar called the victim's home telephone number, but there was no answer.[5] Worried, Kassar and another member of the organization went to the victim's apartment. Along with a security guard and a medical technician, they knocked loudly on the victim's apartment door and called out the name of the victim. When there was no response, they used a spare key, opened the door and went inside the apartment. Kassar testified they found the victim in his bedroom in a position of "perfect repose": the victim was "lying on his back, arms by his side, head facing up." Kassar instructed the

---

[5]     The victim did not own a mobile phone.

others to call 911, although based on his medical training, he surmised that the victim had been dead for some time.

Later that evening, Kassar received a message via a social media website from Beth Martinez. Kassar did not know Martinez but came to learn she had been an assistant to the victim in his prior employment, and the victim had listed Martinez as his emergency contact on his apartment lease. Martinez called Kassar and asked if he would accompany her to the victim's apartment the following day to obtain, among other information, the phone numbers of the victim's relatives. Kassar agreed as long as there was "proper police clearance" and an "escort."

Kassar testified the following morning he, along with Martinez and an apartment security officer and manager, went inside the victim's apartment. They searched the victim's telephone directory, found Ison's number and contacted her about the victim's death. Kassar also found on top of the victim's desk a monthly bank statement from an international bank showing a balance of about $9 to $10 million. Given the large amount of money in that account, Kassar called the bank as a courtesy and spoke with the victim's financial advisor, William Conn, informing him of the victim's death.

Martinez testified she met the victim in 1988 when he became the chief operating officer of the company where she worked. Martinez was the victim's assistant. Martinez and the victim remained close friends after Martinez left the company in 1989. The victim told Martinez in early 2010 he had been the victim of identity theft, which had been distressing to him.

7

Martinez testified while in the victim's apartment she was unable to find the victim's wallet, his house and car keys, and his laptop computer. She next called police and the medical examiner's office to determine whether they had any of the missing items. When she found they did not, she told the investigator from the medical examiner's office that she and Kassar had concerns about the victim's death. In response, the investigator said the medical examiner's office was arranging for the victim's body to be transferred from a mortuary to the medical examiner for examination.

Dr. Othon Mena performed the autopsy on the victim on June 10, 2010. Mena testified that toward the end of the autopsy, he viewed the neck of the victim and found hemorrhages on both sides of the neck. Concerned the victim's death could be a homicide, Mena discontinued the autopsy and contacted law enforcement. Detective Juan Sanchez and crime scene specialist Jennifer Sanders viewed the remainder of the autopsy. Sanders collected scrapings from beneath the victim's fingernails.

Mena found several scrapes and bruises on the victim's face, neck and arms. Mena also found the victim's hyoid bone had been fractured; there were also hemorrhages and injuries to the attached muscles. From these injuries and trauma, Mena concluded the victim had been strangled. Mena estimated the victim's time of death was at least one day before his body was discovered.

Mena examined the victim's body on a later date after being given more information about what might have happened to the victim. During this second examination, Mena looked more closely at what he initially believed were two scrapes on

8

the victim's back. Two of the injuries had puncture wounds inside them, and he also discovered some bleeding beneath the skin. Biopsies taken from the injuries showed small bubbles within the layers of the skin that Mena opined were typical of electrocution burns.

Sanchez testified as soon he was notified of the suspicious circumstances surrounding the death of the victim, and before he went to the medical examiner's office to view the remainder of the autopsy, he called the apartment building where the victim lived and left a message to secure the victim's apartment. A few minutes later, an individual from the building called and thanked Sanchez for returning her call. When Sanchez explained he was not returning her call, the individual informed Sanchez she earlier had called another police officer to report that a man had come to the front counter of the apartment building that morning and dropped off a manila folder containing the victim's keys and wallet.

Sanchez along with Detective Michael Lambert went to the victim's apartment and secured it pending the completion of the autopsy. Lambert collected the manila envelope. Inside, he found a key to the victim's car, the victim's wallet and a handwritten note that read: "J, I am returning your wallet and keys you left in the car because phone calls and emails are not working. Answering machine is broken. You need to get an electronic answering service. Missed you at dinner. Hope nothing is wrong. K." Lambert also obtained the surveillance video from security personnel showing an individual later identified as Keigwin entering the building with a manila envelope. The

9

video was played for the jury.

After the autopsy was completed, police obtained a search warrant for the victim's apartment. Police searched the apartment and found seven AFID's (i.e., anti-felon identification devices) in the foyer. Sanchez testified AFID's are small pieces of paper that look like confetti or "hole punches" that discharge when a taser is fired. Police also found two blood stains on the floor of the master bedroom where the victim's body was discovered. Receipts from a market and from a gas station were found in the trash. Both receipts were dated June 6, 2010, and both were generated between 5:00 and 6:00 p.m. Jurors were shown a surveillance video from the market depicting the victim. In the video, the victim did not appear to have any injuries to his face, arms or hands.

The following morning (i.e., June 11, 2010) between 5:40 and 6:00 a.m., Sanchez and Detective Sergeant Joe Howie were standing in the hallway outside of the victim's third-floor apartment. They had completed their search of the victim's apartment and were waiting for a forensics team to arrive to dust the apartment for fingerprints. Sanchez testified that the doors to the elevator opened and an individual later identified as Keigwin stepped out, turned right and headed towards the victim's apartment. This individual was carrying a backpack. Sanchez observed this individual had multiple scrapes and abrasions on his face, including a larger one on the bridge of his nose.[6]

Sanders, a crime scene specialist, dusted the victim's apartment for fingerprints and collected swabs from the bloodstains on the floor. She also took photographs of the

---

[6] As discussed *post*, Keigwin was arrested for attempted burglary later that morning.

10

individual later identified as Keigwin and collected a sample of his DNA.

A criminalist subsequently analyzed the evidence for DNA and found the scraping from one of the victim's fingernails contained Keigwin's DNA profile. The swabs of the bloodstains from inside the victim's apartment matched the victim's DNA profile. A latent print examiner subsequently found a print lifted from the interior side of the front door of the victim's apartment was of Keigwin's right middle finger.

William Conn testified he worked for an international bank (bank), the victim had held an account at the bank for about 10 years and Conn had been the victim's financial consultant for about two years before the victim's death. Conn and the victim typically met quarterly to discuss the victim's investments and had last met in mid-May 2010. Conn was aware of the victim's identity theft problem.

Conn testified that on June 9, 2010—one day after Kassar informed him of the victim's death—the bank received an electronic transfer request from an online investment firm (investment firm). Because he knew the victim had been a recent victim of identity theft and because Kassar had notified him the victim was dead, Conn attempted to freeze that transfer. Conn was unsuccessful and, on June 11, 2010, about $8 million was transferred from the victim's bank account to a new account in the victim's name at the investment firm.

Craig Dock was the branch manager of the La Jolla office of the investment firm. He testified to open an account a person needed to provide his or her name, address, date of birth and social security number. Once received, the information was verified by a

11

credit report.

Dock testified the investment firm received an online brokerage account application in the victim's name at 10:42 a.m. (EST) on Monday, June 7, 2010. The application included an email address and telephone number. Dock testified Keigwin was the individual who later that same morning came into the branch office of the investment firm and provided additional information in order to complete the account set up and transfer. Keigwin identified himself as the victim, and Dock watched as Keigwin signed the victim's name, "John G. Watson," to a signature page that the investment firm kept on file. Dock testified Keigwin came back to the branch office "once or twice" later that same day to make sure the transfer was progressing.

Dock testified on June 9, 2010, he called the individual he thought was the victim because "something . . . came up in the credit check." This telephone call was recorded and played for the jury. Dock asked this individual if he had received Dock's previous telephone message in which Dock notified the individual about the fraud alert and told the individual Dock needed to contact him using the phone number listed with the credit reporting agencies. The record shows Sanchez heard Dock's message on the victim's answering machine during the detectives' search of the victim's apartment that began on June 10, 2010.

In response, the individual said he had received Dock's message and claimed that he was having some trouble with a credit card and had put an "alert on things" and that he was traveling and would not be home until the weekend. When the individual suggested

12

that Dock just call and leave a message on his home answering machine, Dock said he had already done that but needed to speak to the victim on that particular phone line. When Dock said he would use that number and call the individual the following Monday, the individual said he was in the process of moving and was canceling "that number effective this weekend." Dock agreed the individual instead could send his driver's license to the investment firm, inasmuch as Dock already had met this individual—who Dock believed was the victim—in person at the branch office.

During this same phone call, Dock asked the individual whether the copy of the driver's license he was sending reflected the "Camino Del Oro" address (where the victim had lived). The individual in response said it did but told Dock he had bought a house and asked to have the street address from that house (i.e., Carmel Mountain Road) printed on the checks of his new account because the individual was moving from his apartment on Camino Del Oro at the end of the month.

Dock testified later that afternoon he received by facsimile a copy of the victim's driver's license. More than $7 million was subsequently transferred from the victim's bank account to the new account opened in the victim's name at the investment firm. The investment firm subsequently froze that account after it was informed the victim was dead.

An employee of a store testified that on June 9, 2010, she helped an individual she later identified through store video surveillance as Keigwin make a copy of a driver's license, which the employee sent by facsimile to the investment firm. The employee

13

described this individual as "really nervous" and someone who "stood out" from her other customers.

Pierrette Featherby was the manager of the apartment building where the victim lived. She testified that among other keys given to the victim was a key to the main entrance of the apartment building that could not be copied. One of the detectives involved in the investigation of the victim's death was present when the "mail lady" told Featherby that the victim's mail was no longer being delivered to his apartment because a change of address form had been submitted.

A credit card investigator testified he was contacted in December 2010 by detectives investigating the victim's death. The investigator testified the victim opened a certain credit card account in 2005, the victim was the only authorized user of that account, and there was a charge on June 6, 2010 of $130.13 from a market. The investigator also noted there were three charges to this account on June 7, 2010: one for $0.10, another for $1 from the "U.S. Post Office" and the last for $152.33. The investigator testified the credit card statement properly listed the victim's address, but a change of address on the envelope showed the credit card statement was sent in the victim's name to a shipping, delivery and mailbox store (mailbox store) located on Carmel Mountain Road.

The owner of the mailbox store testified an individual claiming to be the victim came into the store on June 7, 2010 and completed a form to secure a mailbox at the store. The owner noted this same individual had come into the store a day earlier and had

14

asked about obtaining a mailbox. At trial, the owner identified this individual as Keigwin. The individual charged $152.33 on the victim's credit card to rent a mailbox from June 7, 2010 to January 1, 2011.

San Diego Police Detective Fred Helm testified he was a "cross-sworn special deputy U.S. Marshal assigned to the United States Secret Service on the San Diego Regional Fraud Task Force" and was involved in the investigation of the death of the victim. As discussed *post*, Helm assisted in obtaining a search warrant for, and searching, Keigwin's home. During the search, Helm found on a coffee table inside Keigwin's home a set of papers, including four or five sheets of a facsimile transmission to Dock sent in the name of the victim and a copy of the victim's driver license that also appeared to have been sent to Dock. Helm also found several internal documents from the investment firm used for fund transfers, an authorization to transfer funds form and a contact list that included, among others, the victim and an individual named Lance Keith.

Sanchez testified he found on a piece of paper a sticker from a taser inside a leather folder located on Keigwin's coffee table during the search of Keigwin's home. Also found in Keigwin's home were keys to a safe deposit box. Police obtained a search warrant for the safe deposit box and found Keigwin's passport and social security card and a list of contacts that included the victim and the victim's address, email address, phone number, social security number and date of birth.

Justin Palace testified he was a financial advisor employed by an online trading

15

company.[7]  In January 2010, Palace called the victim to thank him for opening a new account with the online trading company, to introduce himself and to inform the victim of the services they provided.  The victim in response told Palace he had not opened an account with the online trading company.  Palace informed the victim that someone had used the victim's name and social security number to open that account.

The victim in January 2010 reported the identity theft incident to San Diego police.  The victim reported that unauthorized accounts had been opened with the online trading company on January 11, 2010 and with a credit card company on November 9, 2009.

Special Agent Steven Baskerville of the United States Secret Service testified he investigated electronic crimes, had specialized training analyzing the brand of laptop computer owned by Keigwin and had examined Keigwin's laptop and a small external hard drive.  Using a computer program that copied the information in Keigwin's laptop, Baskerville found in the computer's internet history several key words including "taser," the names of various online investing firms/companies, and "GPS" and "GPS tracker." Baskerville also found there were at least "four different users" for the laptop: (1) Keigwin; (2) the mobile media account of Keigwin; (3) "home escrow services"; and (4) "lima bean."  Baskerville testified the lima bean user was tied to the separate email account of jgwatson2@yahoo.com.

Baskerville also testified there was a GPS tracking string on Keigwin's laptop.

---

[7]     Palace and Dock worked at different online investment companies.

16

The GPS longitude and latitude coordinates were sent to the laptop from a smart phone when the two were "synced." The GPS tracker string began on May 9, 2010, and the last transmission of coordinates from the GPS tracker to the smart phone was on the afternoon of June 7, 2010. Baskerville testified that one of the coordinates from the tracking device was near Interstate 805 and Shawline Street on June 6, 2010, about 3:48 p.m., which is the same street where the market is located that the victim visited before his death. Other GPS coordinates were near the victim's apartment.

Lance Keith testified Keigwin was his financial advisor between 2005 and 2010. In April 2010, Keigwin called Keith and Keith agreed to transfer his account to Keigwin's new brokerage house. Keith gave Keigwin his personal information, including his social security number. Keith testified he was contacted by Sanchez after the victim's death and then learned that a taser had been purchased in Keith's name from a taser company.

Daniel Hill testified he was employed by the taser company. The company kept records of all law enforcement and civilian tasers it sold. The taser with the cartridge bearing the same serial number as the AFID's found in the victim's apartment had been sold to a distributor. Hill testified that a request to activate that taser was received from "Keith" on May 11, 2010. The email address provided to activate the taser was jgwatson2@yahoo.com, and the $9.95 background check fee was paid with a credit card belonging to Keigwin. Hill testified a small piece of plastic found in Keigwin's backpack was a "blast door" from the right side of a C2 cartridge that had separated on discharge.

Sanchez testified he obtained a search warrant for the account information for the

17

email address jgwatson2@yahoo.com and found the account had been opened in early February 2009. Although the name on the account was John Watson, the subscriber provided the contact information of kentkeigwin@mac.com and the phone number of Keigwin. A search warrant to Keigwin's telephone provider showed this phone number belonged to Keigwin from 2008 until June 7, 2010.

The internet provider associated with jgwatson2@yahoo.com provided Sanchez with emails dating back to April 2010. Sanchez testified emails were sent to this address by the investment firm and Dock, including on the morning of June 7, 2010. In addition, an email containing a receipt for $1 for a change of address was sent to this address from the United States Postal Service in the afternoon of June 7, 2010, and emails were sent on June 7 and again on June 8, 2010 from the online trading company where Palace worked. Sanchez testified the subject matter of the June 8 email from the online trading company was "three ways to complete your application."

Using information provided by Keigwin's mobile telephone provider, Helm testified he was able to locate where Keigwin's mobile phone had been at particular points in time on June 6, 2010. Between 3:30 and 4:30 p.m., Keigwin's phone was about two or three blocks away from the victim's apartment building. Telephone records suggest Keigwin's mobile phone likely was turned off shortly thereafter because no new signals were received from nearby cell towers. The next signal sent that day from Keigwin's mobile phone was at 10:00 p.m. near Keigwin's residence.

18

DISCUSSION

A.  *Motions to Suppress Evidence*

1.  <u>Additional Background</u>

a.  First Motion to Suppress[8]

Keigwin in late November 2010 filed a motion to suppress evidence under section 1538.5 (first motion).  In his first motion, Keigwin sought to exclude from evidence a laptop computer belonging to the victim that police found in the trunk of Keigwin's car.[9]

Keigwin contended in the first motion that the "automobile exception" to the warrant requirement did not apply because the officers lacked probable cause to believe his car, which was parked "far" from the apartment building where the victim had lived, contained any evidence related to the crime of attempted burglary that officers were then investigating him for when they searched his car; and that the "search incident to arrest exception" did not apply because (i) "there was no issue regarding officer safety," (ii) he could not access his car as it was locked and he had not occupied it for at least an hour before the search and (iii) this exception was limited to a search of the passenger

---

[8]  On December 14, 2012, we granted Keigwin's unopposed motion to augment the record with his first motion to suppress evidence and the People's opposition to that motion.

[9]  Although Keigwin also sought to exclude under section 1538.5 "all observations by police officers and statements by [him] subsequent to the illegal detention," the court correctly ruled that section 1538.5 does not apply to this type of evidence.  (See § 1538.5, subd. (a)(1) ["A defendant may move for the return of property or to suppress as evidence *any tangible or intangible thing* obtained as a result of a search or seizure . . . ."  (Italics added.)].)

19

compartment of a car. He also contended the search of his car could not be justified on the basis of consent.

The first motion was heard in connection with the preliminary hearing. Detective Sergeant Howie testified the medical examiner's office on June 10, 2011 informed detectives of the suspicious nature of the victim's death, after the victim had been found dead in his apartment two days earlier. As noted *ante*, detectives learned a man earlier that day had dropped off at the victim's apartment building a "sealed envelope" addressed to the victim.

Howie testified he went to the victim's apartment building and watched myriad times the surveillance video taken from multiple cameras showing the man delivering the envelope about 9:00 a.m. After reviewing the contents of the envelope and speaking with security at the apartment building, that same day Howie obtained a telephonic search warrant for the victim's apartment and, along with his team of detectives, went to the victim's apartment about 9:30 p.m. to conduct the search.

Howie testified that early in the morning the following day (i.e., June 11, 2010), while they were outside the victim's apartment waiting for additional equipment and personnel to arrive to conduct a forensic search of the apartment, they saw the elevator door open and a man, later identified as Keigwin, exit the elevator. Howie testified a key was required to gain access to the secured apartment building. According to Howie, the man became "extremely nervous" and "started taking quick breaths" when he saw the detectives and, in response to Howie's question, said he was there to "visit a friend."

20

Although Howie did not hear the man's response, Sanchez heard it and later told Howie the man had said he was there visiting "Kent Keigwin."

Howie followed behind as the man began to walk down the hallway. Howie suspected the man could be the same person he saw on the surveillance video dropping off the envelope the day before. Howie observed the man pass several apartment doors and then stop at a balcony and grab the railing. The man appeared to be shaking and had a confused look on his face. Howie approached, put his arm in front of the man and told the man to step back from the railing because Howie thought the man might leap over the railing.

Howie next told the man, "'You're the person that returned [the victim's] keys and wallet.'" The man responded, "No." Nearly certain that the man from the elevator was the man he had seen in the surveillance video, Howie again asked and the man again denied being the person who had dropped off the envelope for the victim. The man also denied knowing the victim.

The record shows after Sanchez told the man words to the effect that "'we got you on film,'" the man admitted he was the person who had dropped off the envelope the previous day. At that point, Howie patted the man down for weapons and found a set of keys along with a loose car key. Howie testified he kept the keys because he believed the large set could be used as a weapon, as they were held by a four or five inch leather cord, and because he suspected the man had been attempting to get into the victim's apartment until he was intercepted by police.

21

Howie testified he next moved the man away from the rail into the hallway near the elevator. Sanchez activated his audio recorder and began to record surreptitiously their conversation.[10] Howie estimated Sanchez activated his recorder within five minutes after the man stepped off the elevator. The man told the officers he did not know why he repeatedly had denied being the one who had delivered the envelope containing the victim's keys and wallet.

Howie testified at this point in time he did not consider the man to be a suspect in the victim's killing, as police were not even then sure the victim had been murdered. Nonetheless, Howie believed the man had information regarding the victim that could be relevant to the investigation. Howie also suspected the man might be there to burglarize the victim's apartment given the early morning hour when the man arrived, the man's behavior in the presence of the officers, and the flashlight and "some loose, plastic, empty plastic bags" that Howie saw inside the man's open backpack.

The man told the detectives he was aware the victim was dead. The man also told them he had not seen the victim for about a year and a half when, by happenstance, they recently had met in a coffee shop and agreed to go biking together. The man said they had in fact gone biking the previous weekend.

Regarding the bicycle ride, the man said that while they were riding in a park near Carmel Mountain Road, he was ahead of the victim when he suddenly heard the victim

10    On September 27, 2012, we granted Keigwin's unopposed motion to augment the record with a transcript of the conversation in the early morning of June 11, 2010 between Keigwin, Sanchez and Howie.

22

"call[] out."  The man looked back and saw the victim had fallen off his bicycle.  The man told the detectives when he turned around on his bicycle to help the victim, the man sustained scratches on his face from a tree branch.  Like Sanchez, Howie testified the scratch marks were visible then on the man's face.

Howie testified the man found the victim on the ground "breathing really shallow" and "a little unconscious[]."  After a period of time, the man said the victim was able to stand and together they walked back to the trailhead where the victim had parked his car.  At that point, the man said they realized the victim had locked his keys and wallet inside the victim's car.

Howie testified when the investigator from the medical examiner's office and police initially went to the victim's apartment on June 8, 2011, after they were notified of the death, they observed a bicycle in the victim's living room.  At that time, they thought the victim's injuries could have been sustained from a bicycle accident, although the record shows during the questioning of the man Howie retrieved the victim's bicycle from the victim's apartment, showed it to the man and noted there was no visible damage to the bicycle.

As they continued to question the man, Howie testified the man's story began to change.  For example, the man first told officers that he and the victim both had parked their cars at the trailhead but later said only the victim's car was parked there.  The man also said he had ridden from his home to the trailhead on his bicycle, which he estimated was about five miles away.

23

The man told the detectives because they had no mobile phones or other means of communication, they decided the man would leave the victim at the trailhead, ride his bicycle home to get his car, and then he alone would go to the victim's apartment and obtain the spare key to the victim's car. The man said he in fact rode home and drove his own car to the victim's apartment building. When he arrived at the apartment building, the man told the detectives he identified himself as the victim and said he needed access to "his" apartment because he did not have "his" apartment key. The man said he was escorted to the victim's apartment and let inside. The man told detectives the apartment was messy, and he had difficulty locating the victim's spare car key, even though the victim had told the man where to look. The man said he eventually found the key in the victim's dresser in the bedroom and drove back to the trailhead where the victim was waiting.

The man told the detectives he put the victim's bicycle in the man's car because the victim allegedly was still in distress and could not drive. Next, he drove the victim to a "medical facility" per the victim's request because, according to the man, the victim was still "kind of woozy" from the accident. The man told officers that he could not remember the name of this medical facility and that he did not stay with the victim at the medical facility because the man was going to a dance. The man said the next day he discovered the victim had left his wallet and car key in the man's car.

The man told the detectives that over the next few days he tried to reach the victim to let the victim know he had his wallet and car key. When the man did not hear back

24

from the victim, he took the victim's wallet and key to the front desk of the victim's apartment building.

A little over 40 minutes after their first contact, the man for the first time asked Howie if he was free to leave. Howie testified that shortly before the man posed this question, Howie had decided to detain the man because the man could not tell the detectives why he was at the victim's apartment that morning and, as a result, Howie "was convinced that [the man] was there to commit a crime . . . ." Howie told the man he was then "officially being detained" because Howie believed the man was "prowling" at the victim's apartment and intending to burglarize it or commit some other crime. Howie next told the man they were going to search the man's car because the victim's laptop was missing, and Howie believed the man might be in possession of it. The man denied having the victim's laptop.

Prior to the search of the man's car, Howie testified he was unsure whether he would cite the man for prowling, which Howie said was a misdemeanor, or arrest him for attempted burglary. Howie testified in either case, he then had concluded there was probable cause to arrest the man. Howie grabbed hold of the man's arm so the man could not leave.

At about the same time Howie determined he had probable cause to arrest the man, Howie testified he gave the man's car key that he had found during the pat-down search to Detective Lambert. Howie told Lambert to locate, but not search, the man's car and to see if anything was visible in "plain view." A few minutes later, Howie and

25

Sanchez escorted the man downstairs.

Once outside, Lambert approached the detectives and the man and said he believed he had found the man's car parked about 500 to 600 feet away from the apartment building. Lambert handed the man's car key back to the man.

Within the next minute, Howie demanded the man hand over his car key. The man refused and said, "Let me go man." Howie responded, "We told you, you can't go right now. You are being detained. We are still investigating this. Let me have your key sir[.]" The record shows Sanchez opened the trunk of the man's car. Inside, the detectives found a laptop computer they believed belonged to the victim. Howie placed the man under formal arrest for attempted burglary, and the detectives handcuffed the victim. Howie testified he believed the man was in possession of stolen property and was there to steal more items from the victim's apartment.

After being placed under arrest, detectives searched the man again and found two additional keys in the man's pocket. Detectives discovered one of the keys opened the security door of the apartment building and the other opened the victim's apartment.

On cross-examination, Howie confirmed the man did not consent to the search of his car. Howie testified he did not obtain a warrant to search the man's car because, in his view, the car was "mobile" and thus a warrant was unnecessary. In addition, he testified it would have taken several hours to obtain a search warrant and thus, out of convenience, he went forward with a warrantless search of the man's car.

At the conclusion of the hearing, Keigwin argued the police lacked probable cause

26

to search his car because it was an "investigatory search" and there were no "exigent circumstances." As noted *ante*, Keigwin sought to exclude the laptop computer police found in the trunk of his car.

The court at the conclusion of the testimony stated it was concerned about Keigwin's Fourth Amendment rights in connection with the car key Lambert had returned to Keigwin while he was in the company of the other detectives and being escorted by the arm away from the apartment building. According to the court, at that point Keigwin "was still not yet considered under arrest. And that's based on Detective Sergeant Howie's testimony. His testimony is that he's still considering the defendant a possible prowler or possible burglar or someone who is going to attempt a burglary."

The court found Keigwin did not consent to the search, and the search could not be justified as incident to a lawful arrest. Regarding this latter point, the court analyzed the issue as follows:

"The legal analysis that I'm to undertake is whether or not the detention to that point had amounted to a defacto [*sic*] arrest, which would have to have probable cause in order to be constitutionally valid. And then the argument might be made that if there's sufficient probable cause to arrest at that point, presumably argument would be made that the car search would be subsequent to arrest. But the facts that I have before me don't bear that out. The facts that I have before me bear out that I don't think that the detention, though it was somewhat lengthy -- it was under an hour. The police were certainly taking proactive efforts to diligently pursue any means of investigation to confirm or dispel their

27

suspicion quickly.

"But I don't believe that with respect to the search of the trunk of the defendant's car the 4th Amendment has been complied with. And so as a result of the failure to comply with the 4th Amendment based on the record before me, I'm granting the defendant's motion to suppress the contents of the trunk of the car. So that would mean the laptop computer."

b. Second Motion to Suppress

The record shows Keigwin filed a second motion to suppress evidence (second motion) about nine months after his first motion. In his second motion, Keigwin contended his arrest was illegal based on the alleged finding of the court in connection with his first motion that police lacked probable cause to arrest before they searched his car. Keigwin also contended that Howie allegedly had "conceded that he lacked probable cause to arrest [Keigwin] for burglary," and that is why Howie had not arrested Keigwin before the search. Keigwin in his second motion sought to exclude from evidence his smart phone, the key that opened the security door to the apartment building where the victim lived, the key that opened the door to the victim's apartment, his backpack and its contents and any evidence derived from this evidence.

In opposing the second motion, the People contended that the police had probable cause to arrest Keigwin before they searched the trunk of his car; that the joint preliminary/suppression hearing showed that Howie subjectively believed he had probable cause to arrest Keigwin before the search of Keigwin's car and that his belief

28

was objectively reasonable and supported by compelling evidence; that the evidence taken from Keigwin's person was incident to his lawful arrest; and finally, that the "fruit of the poisonous tree" doctrine did not apply because Keigwin's arrest was supported by probable cause even without the laptop computer that was excluded under his first motion to suppress.

The record shows the court at the hearing indicated it had read the transcript of the preliminary hearing/first motion. The court disagreed with Keigwin's representation of Howie's previous testimony, where Howie allegedly admitted they lacked probable cause to arrest before they found the laptop in the trunk of Keigwin's car:

"THE COURT: No, that is not what he [i.e., Howie] said. He said I have got probable cause to, you know, arrest him [i.e., Keigwin] for attempted burglary, but I don't think the D.A. will file it."

Later in the hearing, the prosecutor offered to have Howie retake the witness stand to clarify further the issue whether the detectives reasonably believed they had probable cause to arrest Keigwin either for prowling or attempted burglary before they searched his car. In making this offer, the prosecutor nonetheless noted there were several places in the preliminary hearing transcript where Howie stated he had probable cause to arrest prior to the search of Keigwin's car.

The court agreed with the prosecutor's representation concerning Howie's preliminary hearing testimony on the probable cause issue, noting as follows:

"THE COURT: I mean, it's up to an officer to make a decision in the field,

29

whatever he or she decides is one thing. You take it up to the D.A.'s office, if they don't issue, that is a whole other scene. And I think what is in the officer's mind at the time he makes the decision is what is key here. And you have to look at all of that stuff, that led up to the point where, 'No, you are not free to go.' And as he says, in his mind, he had probable cause to believe that this was an attempted burglary, you know, and for sure a prowling. And I think that kind of solves it right there."

The court clarified on the record that whether the district attorney filed the case was largely irrelevant on the issue of probable cause, noting:

"THE COURT: . . . I think at that point when the officer said I have probable cause to believe this, whether or not he thinks the D.A. is going to issue or not is irrelevant to the case. In my opinion, you know, he had that in his mind, that was his mindset. And in reviewing the information I think there was sufficient information for him to make that decision and make, to come to that assumption. And I have no problem with that."

The record shows the prosecutor in any event recalled Howie as a witness. Howie testified that even if they had not discovered the laptop in the trunk of Keigwin's car, Howie was still considering arresting Keigwin for attempted burglary. Moreover, Howie testified that, at a "minimum," Keigwin would have been arrested for prowling and searched incident to that misdemeanor arrest.

After Howie's cross-examination, the court denied Keigwin's second motion, ruling as follows:

30

"I have to evaluate the reasonableness of the information that the police officer had at the time he detained the defendant. And in reading what I read so far, and in listening to what Detective Sergeant Howie has said, you know, there is enough in this court's opinion to suspect that a crime is being—is taking place, whether it is prowling or attempted burglary. He [i.e., Keigwin] comes up, he asks what's going on, it's a murder investigation, he's nervous, what are you doing here, I am here to see a friend, he walks away, he walks past all of the apartments, he goes over, you know, what is going on here. He looks like the guy that left off the wallet and the keys the day before. They go over, they stop him, they talk to him some more, he makes—he makes some statements that changes his tune, et cetera, and after 41 minutes, I think there is sufficient evidence to justify probable cause to detain or to arrest. You know . . . Sergeant Howie . . . has said many times that in his mind he had probable cause to arrest.

"And this bit about whether the D.A. . . . . is going to issue it or not is a whole different situation. [¶] But, you know, in his mind is what counts. And he said, in his mind he had probable cause to detain, and he had probable cause to arrest.

"I believe he definitely had probable cause to detain, and that is what he told Mr. Keigwin, hey, you are not free to go. Now at that point, he is basically in custody. He is in custody."

The record shows during a recess the court reviewed the transcript of the conversation between Howie, Sanchez and Keigwin surreptitiously recorded by Sanchez on the morning of June 11, 2010. After the recess, the court noted on the record that this

31

transcript "fortified" its view the police had probable cause to arrest Keigwin prior to their search of Keigwin's car. The court found "a lot of information" in the transcript giving Howie "probable cause to believe that [Keigwin] is up to no good, no good being either prowling or attempting burglary. And that gives a probable cause."

2. Guiding Principles

In reviewing the ruling on a motion to suppress when there is a conflict in the evidence, we defer to the trial court's factual findings, express or implied, if supported by substantial evidence. (*People v. Redd* (2010) 48 Cal.4th 691, 719.) The power to judge credibility, weigh evidence and draw factual inferences is vested in the trial court. (*People v. James* (1977) 19 Cal.3d 99, 107.) However, when the evidence is essentially undisputed we exercise independent review in determining whether police lawfully seized evidence. (See *People v. Middleton* (2005) 131 Cal.App.4th 732, 738.)

Moreover, in determining whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Redd*, *supra*, 48 Cal.4th at p. 719; *People v. Glaser* (1995) 11 Cal.4th 354, 362.) In so doing, we apply federal constitutional standards. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.) Although the prosecution has the burden of establishing the reasonableness of a warrantless search in the trial court, the appellant bears the burden of demonstrating error on appeal. (*People v. Jenkins* (2000) 22 Cal.4th 900, 972.) We will affirm the trial court's ruling if it is correct on any applicable theory of law. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

Warrantless searches are presumptively unreasonable under the Fourth Amendment of the United States Constitution.  (*People v. Troyer* (2011) 51 Cal.4th 599, 602; see also *Arizona v. Gant* (2009) 556 U.S. 332, 338.)  Evidence obtained during a stop, search or seizure which violates the Fourth Amendment must generally be excluded. (*Mapp v. Ohio* (1961) 367 U.S. 643.)  Under the fruit of the poisonous tree doctrine, evidence that is gathered as a direct or indirect result of the illegal search will also be excluded.  (*Wong Sun v. United States* (1963) 371 U.S. 471.)

One such exception to the warrant requirement that is implicated in the instant case is a search incident to a lawful arrest.  (*Arizona v. Gant*, *supra*, 556 U.S. at p. 338.) "This exception 'has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.  [Citation.]'  [Citation.]  As the high court has explained:  'When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed.  To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless "search of the arrestee's person and the area 'within his immediate control' . . . ."  [Citations.]  [¶]  Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence.  The potential dangers lurking in all custodial arrests make warrantless searches of items within the "immediate control" area reasonable without

33

requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. [Citations.]' [Citation.]" (*People v. Diaz* (2011) 51 Cal.4th 84, 90, fn. omitted.)

As relevant here, an officer can make a warrantless arrest when the officer has probable cause to believe the person to be arrested has committed a misdemeanor in the officer's presence (§ 836, subd. (a)(1)) or when the "officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." (*Id.*, subd. (a)(3).) "'Probable cause for arrest exists "when the facts known to the arresting officer 'would lead a [person] of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' [Citation.]" [Citation.]'" (*People v. Limon* (1993) 17 Cal.App.4th 524, 537.) When an officer has probable cause to arrest a person, a warrantless search is justified as a search incident to arrest. (*Virginia v. Moore* (2008) 553 U.S. 164, 178; *People v. Dibb* (1995) 37 Cal.App.4th 832, 836-837.)

3. Analysis

Although there is no dispute the court in the first motion suppressed the laptop computer after finding the police violated Keigwin's Fourth Amendment rights when they searched the trunk of his car, there is a dispute regarding the basis for that ruling.

Keigwin, on the one hand, contends the court excluded the laptop computer from evidence because it found in connection with his first motion to suppress that the detectives lacked probable cause to arrest. Keigwin further contends that in ruling on his

34

second motion, the court was bound by that finding.  Keigwin relies on subdivision (j) of section 1538.5[11] and contends that, because the People did not request a special hearing within 15 days after the preliminary hearing, the People could not challenge at the second motion hearing the ruling made by the court in connection with his first motion that his arrest was illegal, and that the court in connection with his second motion could not make a contrary finding.  As such, he contends the court in connection with the second motion erred when it found there was probable cause to arrest him before police searched his car and, therefore, when it rejected the argument the items found on his person and his backpack were fruits of the poisonous tree.

The People, on the other hand, contend that the court in the first motion merely found Keigwin was not yet formally arrested when the detectives searched his car and,

---

[11]    Subdivision (j) of section 1538.5 provides in part:  "If the property or evidence relates to a felony offense initiated by complaint and the defendant's motion for the return or suppression of the property or evidence at the preliminary hearing is granted, and if the defendant is held to answer at the preliminary hearing, the ruling at the preliminary hearing shall be binding upon the people unless, upon notice to the defendant and the court in which the preliminary hearing was held and upon the filing of an information, the people, within 15 days after the preliminary hearing, request a special hearing, in which case the validity of the search or seizure shall be relitigated de novo on the basis of the evidence presented at the special hearing, and the defendant shall be entitled, as a matter of right, to a continuance of the special hearing for a period of time up to 30 days.  The people may not request relitigation of the motion at a special hearing if the defendant's motion has been granted twice. If the defendant's motion is granted at a special hearing, the people, if they have additional evidence relating to the motion and not presented at the special hearing, shall have the right to show good cause at the trial why the evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding, or the people may seek appellate review as provided in subdivision (o), unless the court, prior to the time the review is sought, has dismissed the case pursuant to Section 1385. If the case has been dismissed pursuant to Section 1385"

35

thus, that court never expressly ruled on the issue whether the detectives reasonably believed there was probable cause to arrest Keigwin prior to that search.

Because the statutory sanction in subdivision (j) of section 1538.5 "prevent[ing] the People from introducing relevant evidence in superior court because of a ruling by a magistrate [at a preliminary hearing] is a severe one," to invoke this sanction there must be, among other requirements, "an *unambiguous* ruling by the magistrate sufficient to put the People on notice that a hearing in superior court must be sought." (*People v. Williams* (1989) 213 Cal.App.3d 1186, 1196, italics added.)

Here, we conclude the court's ruling suppressing the laptop is ambiguous on the issue whether police had probable cause to arrest Keigwin before they searched his car. Indeed, the record shows the court found Keigwin was not formally arrested when police searched his car. Moreover, there is nothing in the record to suggest the court applied and/or analyzed the test to determine whether there was probable cause to arrest in connection with the validity of the search of Keigwin's car, including whether "'the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.'" (*People v. Thompson* (2006) 38 Cal.4th 811, 818.) And, as noted *ante*, Keigwin raised myriad grounds to support his contention that the search of his car was illegal. As such, we conclude subdivision (j) of section 1538.5 did not bar the court from considering the issue of probable cause to arrest Keigwin in connection with his second motion to suppress additional evidence as fruits of

36

the poisonous tree.[12]

We also conclude the record contains ample evidence to support the finding of the court in connection with the second motion that the officers had probable cause to arrest Keigwin either for prowling (§ 647, subd. (h))[13] or attempted burglary (§§ 664 & 459)[14] before they searched his car and found the laptop. As such, we conclude the court did not err when it denied Keigwin's second motion.

Indeed, the record shows that Keigwin arrived at the apartment building where the victim lived early in the morning of June 11, 2010; that Keigwin was able to gain access to the building through a security door; that Keigwin went to the third floor where the victim lived; that Keigwin was surprised and startled when he exited the elevator and found police near the victim's apartment; that Keigwin repeatedly denied he was the

---

[12] In light of our decision, we conclude the case of *Eiseman v. Superior Court* (1971) 21 Cal.App.3d 342, 346-347, relied on by Keigwin, is inapposite because unlike the situation here, in *Eiseman* the superior court refused to be bound by an earlier *unambiguous* ruling of the committing magistrate that led to the suppression of some but not all evidence.

[13] Section 647 provides, in part, that any person "who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] . . . [¶] (h) Who loiters, prowls, or wanders upon the private property of another, at any time, without visible or lawful business with the owner or occupant. As used in this subdivision, 'loiter' means to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered."

[14] Section 664 provides, in part: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts . . . ." Section 459 provides, in part: "Every person who enters any house, room, apartment . . . , with intent to commit grand or petit larceny or any felony is guilty of burglary."

person who had left the victim's wallet and keys at the front desk of the apartment building a day earlier; that Keigwin denied knowing the victim and instead told the detectives he was there to visit "Kent Keigwin"; that the officers then watched Keigwin walk past the other apartments on the floor without once stopping to knock on any of their front doors; that when the police approached Keigwin after he stopped on the balcony, Keigwin was shaking and extremely nervous; that Keigwin appeared to one of the detectives to be contemplating jumping from the third-floor balcony; that when Keigwin finally admitted he was the individual the detectives had seen on the surveillance video of the apartment building, he was unable to explain what he was doing at the victim's apartment; that inside Keigwin's open backpack in plain view was a flashlight and empty plastic bags; that Keigwin told the officers he had received the scratches on his face from a tree limb during a bicycle ride with the victim the previous weekend; that the victim had left his keys and wallet in Keigwin's car after Keigwin dropped off the victim at a "medical facility," the name of which Keigwin could not remember, because the victim had fallen during their bicycle ride, was knocked "a little unconscious[]" and ultimately regained consciousness but was in distress; that when Keigwin helped the victim return to the trailhead after the victim's fall, they discovered the victim had locked his keys and wallet in the victim's car; that Keigwin then rode his bicycle home, drove to the victim's apartment building (as opposed to the trailhead to help the victim), identified himself to personnel at the front desk as the victim and gained access to the victim's apartment, found the victim's spare key in a drawer in the victim's

bedroom and then drove back to the trailhead, where the victim—who was still in distress—waited; that Keigwin said he could not stay with the victim at the "medical facility" because Keigwin was going to a dance; and that Keigwin had subsequently tried without success to reach the victim after Keigwin realized the victim had left his belongings in Keigwin's car.

We conclude this evidence is substantial and supports the finding of the court in connection with Keigwin's second motion that police had probable cause to arrest before they searched his car. As such, we independently conclude the court did not err when it denied Keigwin's second motion and refused to suppress the smart phone and keys police found on Keigwin in the search incident to arrest, or his backpack and its contents.

Moreover, even if Keigwin's Fourth Amendment rights were violated by the search of his car and/or person, we conclude the overwhelming evidence of guilt presented at trial either did not derive from such allegedly obtained evidence or would have been independently discovered by police through proper means.

Under the inevitable discovery doctrine, illegally seized evidence—including evidence derived therefrom—is admissible if "it would have been discovered by the police through lawful means." (*People v. Robles* (2000) 23 Cal.4th 789, 800.) The doctrine is "'an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' [Citation.] The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that

would have been obtained without police misconduct.  [Citation.]  The burden of establishing that illegally seized evidence is admissible under the rule rests upon the government."  (*Id*. at pp. 800-801, fn. omitted.)

To establish inevitable discovery, the prosecution "must demonstrate by a preponderance of the evidence that, due to a separate line of investigation, application of routine police procedures, or some other circumstance, the [unlawfully obtained evidence] would have been discovered by lawful means."  (*People v. Hughston* (2008) 168 Cal.App.4th 1062, 1072.)

Here, the record shows that *before* Keigwin unwittingly "injected himself" into the investigation by appearing at the victim's apartment in the early morning of June 11, 2010, the police already had several leads and important pieces of information in connection with their investigation of the victim's death, as has been summarized in detail *ante*, that they would soon learn pointed towards Keigwin as a suspect.  None of these leads and pieces of information (i.e., the surveillance video from the apartment building and the phone message from Dock on the victim's answering machine, among many others) were derived from the alleged illegal search of Keigwin's car or the subsequent search of his person incident to arrest.

In addition, assuming arguendo the police obtained evidence (i.e., the laptop or the smart phone, the keys and backpack) allegedly through "unlawful means" (i.e., the alleged unlawful search of Keigwin's car or person), from this record we conclude all such evidence would have been inevitably discovered by the police through the

40

application of routine police procedures and separate investigation, as summarized *ante*. (See *People v. Hughston*, *supra*, 168 Cal.App.4th at p. 1072.)

B. *Motions to Traverse the Search Warrants*

1. Brief Additional Background

Keigwin filed motions to traverse the search warrants for his (i) safe-deposit box, (ii) cell phone/records from his telephone provider and (iii) home. All three motions were based on the alleged unlawful search of the trunk of his car, his alleged illegal arrest and the allegedly false statement in each affidavit in support of each of the warrants that a detective met with Dock on June 10, 2011, when in fact the detective met with Dock one day later, on June 11. Keigwin contended police intentionally used the wrong date to make it appear Keigwin already was under investigation before the police illegally searched the trunk of his car in order to inflate artificially the "probable cause needed for a search warrant."

Moreover, as to the warrant to search his home, Keigwin further contended the affidavit prepared by Howie "embellished the circumstances surrounding the suspicious nature" of the victim's body and contained the misstatement that the mortuary had contacted the medical examiner's office about "'unusual trauma'" to the victim's body, when in fact it was the medical examiner's office that renewed its jurisdiction over the body of the victim after it initially ruled the victim had died of natural causes.

The record shows the court denied the motions to traverse. As relevant here, the court found the "one day mistake" regarding when police talked to Dock "irrelevant." It

41

also found Howie's mistake regarding why the medical examiner's office renewed jurisdiction over the victim was not necessary to the finding of probable cause for issuance of the warrant "because the body was sent back, they examined it and did the autopsy . . . ."

    2.  <u>Guiding Principles</u>

A defendant moving to *quash* a search warrant asserts the warrant on its face lacks probable cause. (*People v. Hobbs* (1994) 7 Cal.4th 948, 965, 974.) A defendant moving to *traverse* a warrant "mount[s] a subfacial challenge, i.e., attack[s] the underlying veracity of statements made on the face of the search warrant application." (*Id.* at p. 965.)

Generally, to prevail on a motion to traverse, the defendant must show: (1) the affidavit contained "(1) . . . a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" (*People v. Hobbs*, *supra*, 7 Cal.4th at p. 974; see also *People v. Heslington* (2011) 195 Cal.App.4th 947, 957, fn. 7.) If the defendant makes a successful preliminary showing, the trial court must conduct an evidentiary hearing pursuant to *Franks v. Delaware* (1978) 438 U.S. 154, in which the defendant is required to prove the same two elements by a preponderance of the evidence. (*People v. Thuss* (2003) 107 Cal.App.4th 221, 230.) If the defendant meets the preponderance of the evidence standard, the warrant must be voided and any evidence seized pursuant to it must be suppressed. (*Ibid.*)

"'The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." [Citation.]' [Citations.] '[T]he warrant can be upset only if the affidavit fails as a matter of law [under the applicable standard announced in *Illinois v. Gates* [(1983)] 462 U.S. [213,] 238 to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony. [Citations.]' [Citation.] This standard of review is deferential to the magistrate's determination. [Citation.]" (*People v. Thuss*, *supra*, 107 Cal.App.4th at p. 235.) The same standard of review applies when reviewing the trial court's ruling on the motion to suppress on appeal. (*People v. Campa* (1984) 36 Cal.3d 870, 879, overruled on another point by *Illinois v. Gates*, *supra*, 462 U.S. at p. 238.)

    3. Analysis

Initially, given our conclusion *ante* that the court did not err when it found police had probable cause to arrest Keigwin before they searched his car, and given that neither

43

the laptop found in Keigwin's car nor its contents was admitted into evidence at trial, we reject Keigwin's contention the court erred in denying the challenged search warrants on the basis they were tainted by his alleged unlawful arrest and searches. We thus turn to his remaining contentions.

The record shows the court properly followed the law when it considered the alleged misstatements and/or omissions in each of the affidavits in support of the search warrants. (See *People v. Hobbs*, *supra*, 7 Cal.4th at p. 974.) As to the misstatement regarding the one-day difference when police spoke to Dock, the court found it immaterial. As to the misstatement by Howie[15] regarding why the medical examiner's office renewed jurisdiction over the body of the victim, the court excised that statement, retested the affidavit for probable cause and found the warrant sufficient.

We conclude the court did not err in denying the motions to traverse. The one-day difference in dates did not change the fact that police went to the office of the investment firm, spoke to Dock and learned that someone posing as the victim had opened an account with the firm on June 7, 2010. It also had no bearing on the fact that Dock identified Keigwin as the individual who had posed as the victim when opening that account. (See *People v. Thuss*, *supra*, 107 Cal.App.4th at p. 235.)

Similarly, the circumstances as to how and why the medical examiner's office renewed jurisdiction over the victim's body had no bearing on the fact that the medical

_____

15    We assume for purposes of argument only that Howie's misstatement regarding the reason why the medical examiner's office renewed its jurisdiction over the body was made "'knowingly and intentionally, or with reckless disregard for the truth.'" (See *People v. Hobbs*, *supra*, 7 Cal.4th at p. 974.)

44

examiner conducted an autopsy on the body and determined the death of the victim "was suspicious for strangulation . . . ." It also did not change any of the facts and circumstances, discussed in detail *ante*, regarding law enforcement's contact with Keigwin that *he* initiated in the early morning hour on June 11, 2010. We conclude these facts, among many others, were sufficient to establish probable cause to search Keigwin's home. (See *People v. Thuss*, *supra*, 107 Cal.App.4th at p. 235.)

C. *Parole Revocation Fine*

Keigwin contends—without dispute from the People—that the court erred when it imposed pursuant to section 1202.45 a parole revocation fine of $10,000 and stayed that fine. He further contends that, because he was sentenced to life without the possibility of parole, his sentence does not include a period of parole. We agree. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185.)

45

DISPOSITION

The court is directed to strike from the abstract of judgment the stayed parole revocation fine of $10,000 imposed on Keigwin under section 1202.45. The court is further directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment of conviction of Keigwin is affirmed.


BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.