[No. A118939. First Dist., Div. Five. Nov. 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
BOOT HUGHSTON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, parts II. and III. of this opinion are not certified for publication.

1064

COUNSEL

Joseph Morehead for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMONS, J.—Like a 19th-century itinerant peddler, appellant Boot Hughston arrived in Mendocino County in the summer of 2006 to sell his wares.

Instead of pushing a cart, he drove a rented Hummer, and in place of pots, pans and other dry goods, he sold illegal drugs. At a designated campsite, appellant pitched a tentlike structure that surrounded the Hummer, several smaller tents and an eating area. Then he began pitching his products. An undercover federal drug enforcement agent observed him engage in two hand-to-hand transactions. Searches of his backpack and the Hummer revealed an inventory sufficient to justify charges for four narcotics offenses: possession of cocaine for sale (Health & Saf. Code, § 11351) (count one),[1] possession of methylenedioxymethamphetamine (MDMA) for sale (Health & Saf. Code, §§ 11378, 11401, subd. (a)) (count two), possession of psilocybin mushrooms for sale (Health & Saf. Code, § 11378) (count three), and possession of nitrous oxide (Pen. Code, § 381b) (count four). Appellant unsuccessfully challenged the two searches in the trial court pursuant to Penal Code section 1538.5 and renews that challenge on appeal. In the unpublished portion of our decision, we uphold the backpack search; in the published portion we conclude the warrantless search of the Hummer, located inside the tent structure, violated the Fourth Amendment to the United States Constitution. We remand to permit appellant to withdraw his guilty plea if he chooses to do so.

## FACTUAL AND PROCEDURAL BACKGROUND

At the hearing on the motion to suppress, Special Agent Nishiyama testified that he was working in an undercover capacity for the California Department of Justice, Bureau of Narcotic Enforcement, on June 23, 2006, at the Sierra Nevada World Music Festival held at the Mendocino County Fairgrounds. One of his goals was to look for sales of controlled substances within the fairgrounds, because the World Music Festival had experienced previous problems with such transactions. At approximately 7:30 p.m., Nishiyama first noticed appellant on the fairgrounds, standing with two other people, holding an open backpack into which all three were peering. He saw appellant reach into the backpack, take out a small baggie, remove two capsules from it, and hand them to one of the other two people. He then saw that person hand appellant a couple of bills, at least one of which did not appear to be a $1 bill.

Based on his observations, as well as his training and experience with illegal drug sales, Nishiyama concluded the exchange was a narcotics transaction. He decided to detain appellant, and he believed appellant's backpack contained other narcotics. Nishiyama called the sheriff's office and asked that a uniformed sheriff's deputy respond to his location and detain appellant.

---

[1] As to count one, the information alleged that appellant possessed for sale a substance containing 28.5 grams or more of cocaine and 57 grams or more of a substance containing cocaine (Pen. Code, § 1203.073, subd. (b)(1)).

Before a deputy arrived, Nishiyama observed appellant meet up with another person, an unidentified male. Nishiyama again observed a transaction between the men: appellant reached into the backpack, removed a capsule from a plastic baggie and handed it to the other man. After looking at the capsule in the palm of his hand, the unidentified male handed one bill to appellant.

The first uniformed deputy to respond to Nishiyama's call for assistance, Deputy Nordine, drove by appellant in a marked patrol car. Nishiyama thought appellant appeared "unsettled because [as] the patrol car had gone by him," appellant immediately changed direction and walked away from it. Two other uniformed deputies, McBride and Riboli, arrived on the scene, and Nishiyama told them to detain appellant. They did so.

Appellant was transported to a fire station across the street from the fairgrounds that served as a base of operations for the officers. Nishiyama arrived shortly thereafter, was informed by the deputies of the backpack's contents, and searched the backpack himself. Nishiyama testified he discovered approximately 20 more of the capsules he had observed earlier. These capsules were later determined to contain MDMA. He also found plastic baggies containing psilocybin mushrooms, and several other small baggies containing cocaine. In the backpack, Nishiyama also discovered a set of keys on a keychain with a small card stating the keys were for a Hertz rental, a white Hummer, with a specific license plate number.

Upon completion of the search, Nishiyama placed appellant under arrest. At no point was appellant read his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]). Nishiyama questioned appellant about the Hummer, and appellant informed Nishiyama he was the renter. Nishiyama then asked appellant where the vehicle was parked, and appellant told him "it was in a parking lot somewhere in the front of the fairgrounds." Nishiyama directed Riboli to search the fairgrounds' parking lots for the Hummer.

Riboli eventually located the vehicle on the fairgrounds and confirmed its license plate number. Nishiyama walked to the Hummer's location. All but the left front bumper of the vehicle was covered by tarps, which were attached to a 10- by 30-foot aluminum A-frame. The tarps were attached with "zip ties" to the A-frame and to the front grill, mirrors, and other parts of the Hummer. One side of the tarp structure had a flap that was not zip-tied all the way down; it appeared to be a means to enter and exit the tarp-covered area. Almost the entire vehicle, as well as a makeshift kitchen, sleeping bags, chairs, and tents were contained within the tarp structure.

Nishiyama pulled aside the untied tarp flap, entered the structure and tested the key in the driver's side door to see if it fit the lock, which it did. After opening the Hummer's door, Nishiyama searched the vehicle. The search revealed approximately 800 more MDMA capsules, "a couple pounds" of psilocybin mushrooms, marijuana, approximately a quarter-pound of cocaine, a tank of nitrous oxide approximately five feet tall, about 1,000 balloons, cash, and appellant's wallet.

After the search was completed, Nishiyama learned that Hertz had requested the Hummer be towed. Nishiyama directed Nordine to have the vehicle towed and to "do the CHP 180," a form used by law enforcement agencies in California whenever they tow a vehicle. Completion of the form involves a survey of the condition of the exterior and interior of the vehicle, as well as an inventory of all articles found inside of the vehicle. After the CHP 180 form was completed, the Hummer was loaded onto a flatbed towing truck and driven away.

An information was filed September 20, 2006, charging appellant with the four narcotics offenses. After his motion to suppress was denied by the trial court, appellant pled guilty to counts one and two and admitted the special allegation to count one. The court sentenced him to three years eight months in prison, stayed execution, and placed him on formal probation for 60 months.

## DISCUSSION

### I. *Standard of Review*

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; see also *People v. Woods* (1999) 21 Cal.4th 668, 673–674 [88 Cal.Rptr.2d 88, 981 P.2d 1019] ["while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search [or detention] on the facts so found"].)

II., III.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1062.

IV. *Did the Trial Court Err in Denying the Motion to Suppress as to the Contraband Found in the Hummer*

The trial court concluded the search of appellant's Hummer was legal under the so-called automobile exception to the Fourth Amendment's warrant requirement. The exception permits the warrantless search of a vehicle if there is probable cause to believe the vehicle contains evidence of a crime, even though there are no exigent circumstances that preclude obtaining a search warrant. (*Maryland v. Dyson* (1999) 527 U.S. 465, 466–467 [144 L.Ed.2d 442, 119 S.Ct. 2013].) Appellant contends the search was outside the scope of the automobile exception because in order to access the interior of the vehicle the officers first had to enter the tarp structure that enclosed the Hummer, and this entry violated the Fourth Amendment. Respondent argues appellant lacked a legitimate privacy interest in the tarp structure and, in any event, the evidence was admissible under the inevitable discovery exception to the exclusionary rule.

A. *Did Appellant Have an Objectively Reasonable Expectation of Privacy in the Tarp Structure*

■ "The Fourth Amendment protects an individual's reasonable expectation of privacy against unreasonable intrusion on the part of the government." (*People v. Jenkins* (2000) 22 Cal.4th 900, 971 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) A person seeking to invoke the protection of the Fourth Amendment must demonstrate both that he harbored a subjective expectation of privacy and that the expectation was objectively reasonable. (*People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3].) An objectively reasonable expectation of privacy is "one society is willing to recognize as reasonable." (*People v. Camacho* (2000) 23 Cal.4th 824, 831 [98 Cal.Rptr.2d 232, 3 P.3d 878].) Stated differently, it is an expectation that has " ' "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." ' " (*Ayala*, at p. 255.) In this case, the parties agree appellant demonstrated a subjective expectation of privacy in the tarp structure; thus, we need only decide whether appellant met his burden of showing his expectation of privacy was objectively reasonable. (*Jenkins*, at p. 972.) Because the relevant facts are not in dispute, our review on this issue is de novo. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1172 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

It is important to describe the appearance and location of the structure at issue in this case. The structure was composed of an aluminum frame covered with tarps; the tarps were tied to and draped over and around the frame and the Hummer. The structure completely enclosed a 10- by 30-foot area that

included within it tents, an eating area, and the Hummer. A loose flap permitted ingress and egress. The front fender of the Hummer was exposed to the outside, providing a view of the vehicle's license plate. Nishiyama described the location of the tarp structure as follows: "It's a camping area. There's tents, there's cars, there's people, campsites. By campsites, I mean people had laid out chairs to sit in various areas. It's part of the [fairgrounds] that's set aside for people to camp in." Appellant's companions testified they erected the structure as a place to stay during the three days of the music festival.

■ The particular arrangement of the vehicle and tarp structure in this case is unusual if not unique in Fourth Amendment jurisprudence. However, we conclude the tarp structure is equivalent to a large camping tent. There are superficial differences from common camping tents: the structure was make-shift, it was large enough to encompass smaller tents and an eating area, and its design incorporated the entirety of the Hummer. Nevertheless, the structure was functionally identical to a camping tent, in that it was a temporary structure designed to provide its occupants a degree of protection from the elements and privacy while staying outdoors. No California court has ruled on whether a person has a reasonable expectation of privacy in a camping tent, but other courts have extended Fourth Amendment protections to them. *U.S. v. Gooch* (9th Cir. 1993) 6 F.3d 673 (*Gooch*) held a defendant had an objectively reasonable expectation of privacy in a tent pitched in a legal public campground. *Gooch* declined to analogize the tent to a mobilehome, which may be subject to the automobile exception. (*Id.* at p. 677.) In *U.S. v. Sandoval* (9th Cir. 2000) 200 F.3d 659, 660 (*Sandoval*), the court extended the holding in *Gooch* to reach a "makeshift tent" that was "located on Bureau of Land Management . . . land." (See also *People v. Schafer* (Colo. 1997) 946 P.2d 938, 944 [tent pitched on "unimproved, publicly accessible land"]; *Alward v. State* (1996) 112 Nev. 141, 150 [912 P.2d 243] (*Alward*), overruled on another ground in *Rosky v. State* (2005) 121 Nev. 184, 191 & fn. 10 [111 P.3d 690] [tent pitched on Bureau of Land Management (BLM) land].)

Respondent relies on *People v. Thomas* (1995) 38 Cal.App.4th 1331 [45 Cal.Rptr.2d 610] (*Thomas*) to argue appellant was required to show he and his friends were camped lawfully, and asserts "where a tent is pitched on public property without permits or permission or in violation of law there can exist no reasonable expectation of privacy." But *Thomas* held only that a homeless man living in a cardboard box on a public sidewalk, in violation of a law expressly prohibiting him from doing so, did not have a reasonable expecta-tion of privacy in the box. (*Id.* at pp. 1333–1334; see also *United States v. Ruckman* (10th Cir. 1986) 806 F.2d 1471, 1472–1473 (*Ruckman*) [person occupying natural cave on federal land does not have reasonable expectation of privacy].) The defendant in *Thomas* was aware of the illegality because the

city previously had removed another box he had occupied from the same location. (*Thomas*, at pp. 1333–1334.)

*Thomas*'s holding provides little support for respondent's contention that appellant was required to prove his occupancy of the searched site was legal by showing he had paid required camping fees and erected a structure of permissible size. In *Thomas*, the illegality and the defendant's knowledge of the illegality were undisputed. (*Thomas, supra,* 38 Cal.App.4th at pp. 1333–1335.) Further, the ultimate issue is not whether appellant had "a property right" in the location searched by the police, but whether he had "a legitimate expectation of privacy" in that location. (*Rakas v. Illinois* (1978) 439 U.S. 128, 143 [58 L.Ed.2d 387, 99 S.Ct. 421]; see also *Gooch, supra,* 6 F.3d at p. 677; *Alward, supra,* 912 P.2d at p. 249.) *Sandoval* is directly on point. Although it was "unclear" whether the defendant had permission to camp on the BLM land, the court held the reasonableness of the defendant's expectation of privacy did not turn on that issue. (*Sandoval, supra,* 200 F.3d at pp. 660–661.) "Such a distinction would mean that a camper who overstayed his permit in a public campground would lose his Fourth Amendment rights, while his neighbor, whose permit had not expired, would retain those rights." (*Id.* at p. 661.) In distinguishing an earlier decision denying Fourth Amendment rights to a squatter in a private residence, *Sandoval* pointed out that "camping on public land, even without permission, is far different from squatting in a private residence. A private residence is easily identifiable and clearly off-limits, whereas public land is often unmarked and may appear to be open to camping. Thus, we think it much more likely that society would recognize an expectation of privacy for the camper on public land than for the squatter in a private residence." (*Sandoval,* at p. 661.)

 The tent structure was erected on land specifically set aside for camping during the music festival. Appellant's occupancy is clearly distinguishable from the squatter in a private residence (*Sandoval*), or the occupant of a cardboard box (*Thomas*) or a cave (*Ruckman*), who could not reasonably believe he or she had permission to live there. Considering the totality of the circumstances (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1132 [12 Cal.Rptr.3d 483]), we reject respondent's argument that more evidence of appellant's right to camp at the site was required to justify an objectively reasonable expectation of privacy in the tarp structure. As the Colorado Supreme Court reasoned in *People v. Schafer, supra,* 946 P.2d at page 944: "Whether pitched on vacant open land or in a crowded campground, a tent screens the inhabitant therein from public view. Though it cannot be secured by a deadbolt and can be entered by those who respect not others, the thin walls of a tent nonetheless are notice of its occupant's claim to privacy unless consent to enter be asked and given. One should be free to depart the campsite for the day's adventure without fear of this expectation of privacy being violated. Whether of short or longer term duration, one's occupation of

a tent is entitled to equivalent protection from unreasonable government intrusion as that afforded to homes or hotel rooms. [Citations.]"

Because appellant had a reasonable expectation of privacy, entry into the tarp structure violated the Fourth Amendment unless an exception to the warrant requirement applied. (See *Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 88 S.Ct. 507]; *People v. Woods, supra*, 21 Cal.4th at p. 674.) The trial court concluded the automobile exception authorized the vehicle search. However, in order to access the Hummer's interior, Nishiyama had to enter and pass through the tarped-off area. Respondent cites no authority for the proposition that the automobile exception authorized that warrantless entry. (See 3 LaFave, Search and Seizure (4th ed. 2004) § 7.2(b), p. 561 [lesser expectation of privacy in vehicle does not extend to premises housing the vehicle].) Nor does respondent argue that the exigent circumstances exception, or any other exception to the warrant requirement, was applicable. The warrantless entry into the tarp structure invalidated the subsequent vehicle search.[3]

### B. *Does the Inevitable Discovery Exception Apply*

 Respondent contends that even if the search in this case was unlawful, the trial court properly denied appellant's motion to suppress under the inevitable discovery doctrine. The inevitable discovery doctrine acts as an exception to the exclusionary rule, and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." (*Nix v. Williams* (1984) 467 U.S. 431, 447 [81 L.Ed.2d 377, 104 S.Ct. 2501] (*Nix*).) The purpose of the exception is "to prevent the setting aside of convictions that would have been obtained without police misconduct." (*People v. Robles* (2000) 23 Cal.4th 789, 800 [97 Cal.Rptr.2d 914, 3 P.3d 311].) It is the prosecution's burden to "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." (*Nix*, at p. 444; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62 [17 Cal.Rptr.3d 710, 96 P.3d 30].)[4] In that event, the deterrence rationale

---

[3] There is evidence that Hertz requested that Nishiyama seize the Hummer, but this request provided no justification for the warrantless entry of the tarp structure housing the Hummer.

[4] Elsewhere, respondent's burden has been described as a showing of a " 'reasonable probability that [the challenged evidence] would have been procured in any event by lawful means.' [Citation.]" (*People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1215 [49 Cal.Rptr.3d 831] (*Walker*).) We understand these two formulations to be substantively identical. (See *Walker*, at pp. 1215–1216 [referring to, at different points in the decision, both formulations].)

underlying the exclusionary rule would have "so little basis that the evidence should be received." (*Nix*, at p. 444.)[5]

■ At the outset, we note the existence of sufficient probable cause to obtain a warrant to enter the tent and search the Hummer legally does not justify application of the inevitable discovery exception. (*Walker, supra*, 143 Cal.App.4th at p. 1215.) A violation of the Fourth Amendment may not be disregarded " 'simply because the police, had they thought about the situation more carefully, *could* have come up with a lawful means of achieving their desired results.' [Citation.]" (*Walker*, at p. 1216, fn. 30; see also *People v. Robles, supra*, 23 Cal.4th at p. 801 [inevitable discovery exception inapplicable even accepting that police could have obtained a warrant based on plain view of stolen car in garage]; *U.S. v. Reilly* (9th Cir. 2000) 224 F.3d 986, 995 [" 'to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the [F]ourth [A]mendment' "].)

Instead, in order to justify application of the inevitable discovery exception, respondent must demonstrate by a preponderance of the evidence that, due to a separate line of investigation, application of routine police procedures, or some other circumstance, the drugs seized from the Hummer would have been discovered by lawful means. The showing must be based not on speculation but on "demonstrated historical facts capable of ready verification or impeachment." (*Nix, supra*, 467 U.S. at pp. 444–445, fn. 5.) The inevitable discovery exception requires the court " 'to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred.' " (*U.S. v. Cabassa* (2d Cir. 1995) 62 F.3d 470, 473.)

For example, in *Nix*, police officers discovered the location and condition of the victim's body through an unlawful interrogation of the defendant, but the court concluded that a simultaneous independent search would have inevitably led to discovery of the evidence. (*Nix, supra*, 467 U.S. at pp. 449–450.) In other cases, a search would have occurred as a matter of routine police procedure. (See, e.g., *United States v. Andrade* (9th Cir. 1986) 784 F.2d 1431, 1433 [narcotics in bag in possession of lawfully arrested defendant inevitably would have been discovered through lawful inventory search]; *United States v. Martinez-Gallegos* (9th Cir. 1987) 807 F.2d 868, 869–870 [fact that defendant previously had been deported inevitably would

---

[5] "The inevitable discovery doctrine . . . is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (*Murray v. United States* (1988) 487 U.S. 533, 539 [101 L.Ed.2d 472, 108 S.Ct. 2529].)

have been discovered through examination of his immigration file]; see also *U.S. v. Boatwright* (9th Cir. 1987) 822 F.2d 862, 864–865 [citing and discussing cases].)

There are no comparable circumstances in this case. Respondent's argument is largely based on the fact that appellant's companions packed up the tarp structure and left the fairgrounds after appellant was taken into custody and the Hummer was towed away, leaving the entire site empty. From this fact, respondent speculates that "the dismantling of the tent/tarp structure would have left the Hummer alone on public land and available for the officers to search per the automobile exception" or pursuant to impound and inventory of the vehicle, which would have led to discovery of the contraband. But appellant's friends departed only *after* the police had searched the Hummer, found the drugs, and seized both. The record provides no basis for concluding that, absent the search, appellant's friends would have departed before the end of the World Music Festival, abandoning the Hummer and its illegal cargo to the police.

Moreover, respondent provided no evidence that appellant's companions would not have gained access to the interior of the Hummer and removed or destroyed the drugs. A number of courts have recognized that the possibility someone would have removed or destroyed the evidence at issue undermines a showing of inevitability. (See *People v. Bennett* (1998) 17 Cal.4th 373, 392, fn. 7 [70 Cal.Rptr.2d 850, 949 P.2d 947] ["[w]e do not know of any decision holding that the prosecution may resort to the inevitable discovery doctrine to prevent suppression of illegally seized evidence when, as here, a defendant could have caused the removal or destruction of the evidence"]; *U.S. v. Cabassa, supra,* 62 F.3d at p. 473 ["[i]f the process of obtaining a search warrant has barely begun, for example, the inevitability of discovery is lessened by the probability, under all the circumstances of the case, that the evidence in question would no longer have been at the location of the illegal search when the warrant actually issued"]; *U.S. v. Boatwright, supra,* 822 F.2d at p. 865 [the defendant "would not have waited patiently beside his weapons for an agent to arrive with a warrant"]; *U.S. v. Roberts* (2d Cir. 1988) 852 F.2d 671, 676 ["we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena. Thus, the government cannot show that its subpoena would have inevitably resulted in the discovery of the suppressed documents."]; *United States v. Owens* (10th Cir. 1986) 782 F.2d 146, 153 [the defendant or a friend might have moved the contraband]; cf. *People v. Hoag* (2000) 83 Cal.App.4th 1198, 1217 [100 Cal.Rptr.2d 556] (conc. opn. of Morrison, J.) [noting the evidence showed the occupant of the house "was not poised to destroy the evidence"].)

Because respondent failed to present evidence sufficient to support a finding that the contraband would have been discovered by lawful means, the trial court erred in denying appellant's motion to suppress with respect to the contraband located in the Hummer.

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court. That court is directed to vacate the guilty plea if appellant makes an appropriate motion within 30 days after the remittitur is issued. In that event, the superior court should reinstate the original charges contained in the information, if the prosecution so moves, and proceed to trial or another appropriate disposition. If no timely motion to vacate the guilty plea is filed by appellant, the superior court is directed to reinstate the original judgment.

Jones, P. J., and Needham, J., concurred.