Filed 12/20/21  P. v. Quevara CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUAN QUEVARA,<br><br>Defendant and Appellant. | F078311<br><br>(Super. Ct. No. BF172506A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw and Gary T. Friedman, Judges.[†]

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Doris A. Calandra, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[†]    Judge Bradshaw conducted an in camera review of officer personnel records and presided on August 2, 2018; Judge Friedman presided over all other hearings pertinent to this appeal.

A jury convicted defendant Juan Quevara of second degree robbery after he robbed employees of a farm equipment store (the store) in Kern County. On appeal, defendant contends (1) the trial court erred in denying his motion to suppress evidence seized during a patdown search and a more thorough search prior to his arrest; (2) the evidence was insufficient to prove he used force or fear to take property; and (3) this court should review the trial court's *Pitchess* motion ruling and ensure the trial court followed proper procedure in denying it. We affirm.

## PROCEDURAL BACKGROUND

The Kern County District Attorney filed an information on June 26, 2018, charging defendant with second degree robbery (Pen. Code, § 212.5, subd. (c))[1] and alleged that the charged crime was a serious felony within the meaning of section 1192.7, subdivision (c). Defendant pled not guilty on July 2, 2018.

Defendant filed a *Pitchess*[2] motion on July 10, 2018, requesting disclosure of Bakersfield Police Officer Anthony Kidwell's personnel records relevant to dishonesty, false arrest, illegal detentions, and the fabrication of charges, evidence, or reports, and other records. Counsel for the Bakersfield Police Department objected to producing any records other than those relating to dishonesty. The trial court granted defendant's motion for an in camera review and conducted a review of Officer Kidwell's records pertaining to false reporting and honesty on August 2, 2018. After reviewing the records, the court denied the motion for discovery.

Upon hearing the parties' in limine motions on September 17, 2018, the trial court held an Evidence Code section 402 hearing on defendant's motion to exclude evidence of prior bad acts and his statements to police at the time of arrest. As a result of information revealed during that hearing on September 17 and 18, 2018, defense counsel made an oral motion to suppress evidence seized from defendant's person before his arrest. Counsel

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531; see also Evidence Code section 1043.

2.

explained that she only realized at this hearing that a suppression motion was appropriate because the testimony differed from the police report. After allowing more evidence and hearing argument from counsel, the trial court denied the suppression motion.

After a two-day trial, the jury convicted defendant of count 1, second degree robbery, on September 19, 2018.

On October 16, 2018, the trial court denied probation and sentenced defendant to a term of two years in state prison. In addition, the court ordered defendant to pay restitution in amounts to be later determined by probation to Mario (§ 1202.4, subd. (f)) and to the Restitution Fund in the State Treasury (§ 1202.4, subd. (f)(2)), a $300 restitution fine (§ 1202.4, subd. (b)), a stayed $300 parole revocation restitution fine (§ 1202.45, subd. (a)), a $10 crime prevention fund fine (§ 1202.5), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 conviction assessment (Gov. Code, § 70373).

Defendant timely appealed on October 23, 2018.

## FACTS

Mario L. had been employed by the store in Kern County for at least two months as of June 5, 2018, when he saw defendant in the store. The store sold animal feed, mechanical equipment, and other farming items. Mario first saw defendant on the northwest side of the store, in an enclosed outdoor area, where he was placing items in a shopping cart. Mario estimated that he contacted defendant after defendant had been in the store approximately three to four minutes. At the request of his manager, Mario approached defendant and asked him to leave the store.[3] Defendant immediately became upset and threatened Mario.

---

[3] The trial court excluded evidence regarding the reason Mario asked defendant to leave the store. Defendant had been asked to leave the store a month earlier because employees believed he had been stealing. Mario asked defendant to leave the store at the manager's direction due to defendant's earlier conduct.

3.

Mario followed as defendant refused to leave and walked in different aisles around the store, taking items and placing them in his pockets. Mario observed defendant place a key chain, pliers, and number stickers (for use on mailboxes) in his pockets. Mario valued the items at approximately $40 to $50.

During this time, as Mario followed defendant around the store, defendant called him names and threatened to "kick [his] ass." Mario felt afraid hearing defendant's threats. Defendant was in the store approximately 10 minutes and threatened Mario "[t]he whole time." Mario called 911 several times while defendant was in the store. Mario stayed near defendant while trying to get him to leave because Mario was afraid for himself and the women working in the store.

Mario followed defendant, trying to escort him to an area out in front of the store where merchandise was on display. Defendant turned, took a fighting stance, and told Mario, "I'm going to kick your fuckin' ass, you bitch." Defendant continued to curse and threatened Mario, causing Mario to get scared, move out of defendant's way, and call 911 again. When he called 911, Mario described defendant as a Hispanic male, either in his late twenties or early thirties, bald, wearing shorts and a black shirt, with a red marking on his hand or forearm.

Defendant walked away through the parking lot with the stolen items in his pocket while continuing to yell threats at Mario. Mario was still frightened as defendant walked away. The police arrived shortly thereafter. Mario saw the police arrest defendant. Mario identified defendant as the man who had threatened him and taken items from the store. Mario testified the key chain, pliers, and number stickers police seized from defendant were those he saw defendant take from the store.

Bakersfield Police Officer Kristopher Jauch responded to the store parking lot at approximately 6:33 p.m. The initial 911 call had been received at 6:21 p.m. and reported a theft. Shortly thereafter he learned that another 911 call was received, reporting that the suspect was making threats to assault employees.

4.

As he drove through the parking lot, Jauch saw defendant, who was the only individual matching the suspect's description. Although the description included a red tattoo, Jauch testified he did not remember if defendant had such a tattoo. Jauch identified defendant's booking photo and acknowledged that defendant was not bald at the time of his arrest. Jauch testified that the booking process generally does not document every tattoo an individual has.

Jauch saw defendant near a coffee shop in the same parking lot (the coffee shop), approximately 200 yards from the store. Defendant did not initially respond to Jauch's commands to come to him. Once defendant complied, Jauch searched defendant and seized a key chain, pliers, and number stickers from the pockets of defendant's shorts. Jauch testified he could not remember if these items had tags indicating they were from the store.

During rebuttal, defense counsel introduced into evidence a stipulation that Bakersfield Police Officer Mark Rice,[4] if called to testify, would testify that he did not recall seeing a tattoo on defendant's arm. The defense presented no additional evidence.

## DISCUSSION

### I. *The trial court properly denied defendant's motion to suppress because the evidence seized during Officer Jauch's searches would have inevitably been discovered following his arrest.*

Defendant argues that the trial court erred in denying his motion to suppress the items seized from him at the time of arrest because Officer Jauch lacked reasonable suspicion to detain him or to believe he was armed and dangerous. The People respond that defendant's detention and patdown search were supported by reasonable suspicion that he committed a crime and might be armed and dangerous. Reasonable suspicion ripened to probable cause supporting the search of defendant's person. We agree that reasonable suspicion supported defendant's detention but do not reach the legality of the

---

[4] Although not explained to the jury, Officer Rice responded to the store on June 5, 2018, as described below.

5.

searches as we agree with the trial court that the items seized from defendant would have inevitably been discovered during a search of defendant incident to his arrest. We conclude the trial court properly denied defendant's motion to suppress evidence.

## A. Background—Evidence Code Section 402 Hearing Testimony

Before trial, the trial court held an evidentiary hearing addressing defendant's motion to exclude evidence of his prior bad acts and statements to police. After Officers Kidwell and Jauch testified, defense counsel alerted the trial court to an issue relating to the legality of Jauch's searches of defendant.[5] After concluding the section 402 hearing later that day, defense counsel orally moved to suppress the evidence seized from defendant before his arrest based upon the testimony adduced.

### 1. *Mario L.'s Testimony*

Mario worked for the store since April 2018. Mario first saw defendant in May 2018, one month prior to the instant offense, when defendant was asked to leave the business. Mario next saw defendant on June 5, 2018, and recognized him from the May encounter. That day, Mario personally saw defendant take and steal items including pliers and number stickers.

### 2. *Officer Kidwell's Testimony*

#### a) **Initial Testimony**[6]

Officer Kidwell was working on June 5, 2018.[7] He responded to the store that day. When he arrived, he spoke first to Mario to confirm an offense had occurred, and

---

[5] Kidwell's police report erroneously described that he found the seized items during a postarrest search of defendant. The officers' testimony revealed that Jauch had performed the two searches of defendant yielding the seized evidence while Kidwell's search did not result in any seizure.

[6] Because the purpose of the hearing evolved, after his initial testimony, Kidwell was recalled for additional testimony.

[7] As of September 17, 2018, Kidwell had been employed with the Bakersfield Police Department for one year.

Mario pointed out defendant as the suspect. Defendant matched the description of the suspect.

Kidwell learned from Officer Rice, who had also responded to the scene, that while Kidwell was speaking with Mario, Rice had searched defendant and removed items from defendant's pockets.[8] Kidwell later contacted defendant and searched him before transporting him to jail.

### b) Further Testimony

When recalled, Kidwell testified he arrived at the store within minutes of the arrival of Jauch and Rice. Because he was newer to the Bakersfield Police Department, Kidwell was assigned to speak with Mario and determine whether an offense occurred while Jauch and Rice contacted defendant. After speaking with Mario, Kidwell contacted Jauch and Rice, learning that they had found items during a search of defendant. The seized items included a pair of pliers, number stickers, and a double spring hook.[9] Kidwell later confirmed with Mario that these items were sold by the store.

Kidwell did not find these items during his search of defendant, though his report mistakenly indicated that Kidwell had seized them during his search of defendant.[10] When Kidwell searched defendant, he did not find anything in defendant's pockets.

Kidwell searched defendant after his arrest pursuant to standard practice and procedure. As required by policy, before placing defendant in his patrol vehicle, Kidwell searched defendant to ensure that nothing that could harm Kidwell had been missed in an earlier search. Kidwell was trained to search every suspect before placing them in his patrol vehicle for his own safety.

---

[8] Rice subsequently testified that he did not search defendant, arriving after the search had occurred.

[9] Some witnesses referred to this item as a key chain. While the item had a tag attached, Kidwell could not recall if it indicated being from the store.

[10] Kidwell's report is also incorrect in that it provides he searched Mario when, in fact, he actually searched defendant.

### 3. Officer Jauch's Testimony

Officer Jauch responded to the store on June 5, 2018. He had heard a report of a theft in progress, later updated to indicate the suspect was threatening to assault the staff. The initial 911 call was received at 6:21 p.m., and Jauch arrived at approximately 6:33 p.m.

Jauch received a description of the suspect from the radio, remembering only that he had been described as a Hispanic male who was wearing a black shirt, black or gray shorts, and possessed a red tattoo. In addition, Jauch heard on the radio that the employees had followed the suspect to the coffee shop.

Jauch believed that he was the first person on the scene and, upon arrival, drove around the parking lot. Approximately 200 yards from the store, and within the same parking lot shared by the store and other businesses, Jauch saw defendant walking away from the store and to a bike just outside of the coffee shop. Observing at least 10 other individuals outside of the coffee shop, Jauch approached defendant who most closely matched the suspect's description. While Jauch could not remember descriptions of the other individuals at the coffee shop, defendant was the only person whose clothing matched the suspect's description. Jauch could not remember if defendant had a tattoo.

Jauch ordered defendant to come to him. Defendant ignored him and Jauch repeated his command two or more times. Defendant eventually complied with Jauch's directions after repeated commands. Jauch acknowledged that defendant had not verbally threatened him, acted aggressively, nor had Jauch observed defendant with a weapon. Nonetheless, Jauch believed defendant may have had a weapon as Jauch's past experiences showed that theft suspects have been armed with box cutters, knives, and wire cutters. In addition, defendant did not respond to Jauch's directions to approach him, attempting several times to walk away. Jauch believed that defendant may have had a weapon because of the reluctance and hesitance he exhibited.

8.

Jauch patted defendant down, looking for weapons, and removed black and red wire cutters from his right pants pocket. Defendant sat on a curb while Jauch waited for another officer to arrive. Officer Rice arrived and stayed with Kidwell.

Kidwell responded to the call before Jauch conducted a second search of defendant. Kidwell was speaking with the store employees, confirming the offense took place and that Mario identified defendant as the suspect. Jauch never spoke to any witnesses himself but learned that Kidwell had spoken to a witness who identified defendant as the suspect before conducting the second search.

Jauch believed that while Officer Rice was present during the second search, Kidwell was still interviewing witnesses. During the search, Jauch found several white stickers with black numbers and a key chain.

### 4. Officer Rice's Testimony

Officer Rice responded to the store on June 5, 2018. Rice was advised by radio that another officer had contacted the suspect and responded to that location. When Rice arrived, Jauch and Kidwell were with defendant. Rice stood nearby while the other officers conducted their investigation.

### 5. Defendant's Motion to Suppress

Defense counsel argued that Jauch lacked reasonable suspicion to believe defendant was armed when he conducted the patdown search and lacked probable cause to justify the subsequent search of defendant. As to Jauch's patdown search of defendant, defense counsel argued that defendant's verbal threat to Mario, even considering defendant's lack of cooperation with the officer, was not enough to support the officer's belief that defendant was a safety threat and might be armed. Counsel also argued that defendant did not match the suspect's description as he did not have a tattoo and that defendant's proximity to the scene was not significant given the more than 10 minutes that had elapsed since the 911 call. Regarding the subsequent search, counsel argued that at the time of the search, Jauch had not yet learned that Kidwell both confirmed a crime

9.

had occurred and that Mario had identified defendant as the perpetrator; therefore, he lacked probable cause to justify the search.

The prosecutor argued that the items seized from defendant would have inevitably been discovered by the officers when they performed a search incident to defendant's arrest, and justified the patdown search relying upon (1) the officer's past experiences with armed theft suspects; (2) the radio report indicating the suspect had threatened to assault employees; and (3) defendant's initial refusal to follow the officer's directions.

The trial court found defendant's detention was supported by the radio reports Jauch had heard and the patdown search was lawful and supported by concerns for officer safety. Furthermore, the trial court determined that the items would have been inevitably discovered.

### B. Standard of Review

"A defendant may move … to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on … the … grounds … [¶] … [t]he search or seizure without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

### C. Defendant's Detention

Even if lacking probable cause, an officer may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity " 'may be afoot.' " (*United States v. Sokolow* (1989) 490 U.S. 1, 7.) Reasonable suspicion is a less demanding standard than probable cause and is determined in light of the totality of the circumstances. (*Id*. at pp. 7–8.) Innocent

behavior will frequently justify suspicion that " 'criminal activity was afoot.' " (*Id*. at pp. 9–10.)

Officer Jauch heard the broadcast description of the suspect. He was informed by radio that a crime had been committed, that the suspect was a Hispanic male, dressed in a black shirt and gray shorts, with a tattoo, and that he was last seen near the coffee shop. Within minutes of the crime, Jauch observed defendant, a Hispanic male, dressed as described, near the coffee shop, and only 200 yards from the store.[11] Defendant initially disregarded the officer's commands, responding only after repeated commands.

Defendant argues that the significance of defendant's proximity to the crime is dispelled by the lapse between the time of the robbery and Jauch's arrival (approximately 12 minutes). However, Jauch's testimony indicates that while he heard the initial 911 broadcast of the robbery at 6:21 p.m., the report was updated once to advise that the suspect threatened to assault employees, and then again to advise that the suspect had been followed to the coffee shop. Thus, though the initial broadcast may have commenced at 6:21 p.m., the robbery was still in progress and the time lapse between the start of the crime and defendant's apprehension was likely several minutes shorter. Defendant's proximity to the store that was robbed was still an important part of the "totality of the circumstances," and even if 12 minutes had elapsed, we do not find that length of time sufficient to dispel the inference that defendant committed the crime due to his proximity to the scene of the crime. "The ultimate question is whether the description affords a sufficient basis for 'selective investigative procedures,' vis-à-vis a universe made up of all persons within fleeing distance of the crime in question. [Citations.] There is no definitive amount of time that should be considered a bar to a detention based on a particular description." (*People v. Fields* (1984) 159 Cal.App.3d 555, 565.)

---

[11]     Officer Kidwell testified that when arriving at the scene, Mario immediately pointed out defendant as the suspect. However, the evidence is not clear as to when Jauch received this information in relation to his searches of defendant.

Defendant further argues that Jauch lacked reasonable suspicion that defendant was the suspect because Jauch did not remember seeing a red tattoo on defendant's arm.[12] While defendant argues that the discrepancy concerning the tattoo demonstrates a lack of reasonable suspicion, we do not find it dispositive and consider it as part of the "totality of circumstances." The lack of evidence that defendant had a red tattoo on his arm does not diminish the probative value of the other evidence supporting the trial court's finding. (See *People v. Leath* (2013) 217 Cal.App.4th 344, 355 [minor discrepancies in descriptions of the suspect or vehicle are not dispositive for purposes of reasonable suspicion].) Courts have repeatedly held an investigatory detention proper under the totality of the circumstances even when a suspect's characteristics are not an exact match with the victim's description. (See, e.g., *People v. Craig* (1978) 86 Cal.App.3d 905, 911–912 [finding an investigatory detention reasonable even though the defendants did not perfectly match the suspects' descriptions because "the descriptions and appearances were substantially the same, and coincided in the discernable factors (race, sex, build, number)"].)

"It is enough if there is adequate conformity between description and fact to indicate to *reasonable* officers that detention and questioning are necessary to the proper discharge of their duties." (*People v. Smith* (1970) 4 Cal.App.3d 41, 48–49 [holding officers reasonably stopped four African-American occupants in a vehicle located 30 blocks from a robbery involving four African-American suspects that had been broadcasted just minutes before, and stating that discrepancies between the broadcast and the stopped vehicle were minor and did not preclude the formation of reasonable suspicion]; see *People v. Lazanis* (1989) 209 Cal.App.3d 49, 54, 59 [investigatory stop supported by following facts: broadcast of a burglary in progress; brief description of a small car and multiple passengers; and observation of car in the area headed away from

---

[12] The record on appeal contains no evidence as to whether defendant possessed a red tattoo at the time of the crime.

the burglary shortly after the broadcast, even though car was a different model]; *People v. Jones* (1981) 126 Cal.App.3d 308, 312–313 [broadcast of a recent assault, description of vehicle and license plate, and description of suspects as two African-American males justified stop of vehicle in the area four minutes after crime occurred, even though license plate was not an exact match]; *People v. McCluskey* (1981) 125 Cal.App.3d 220, 226–227 [report of robbery in the area justified stop of vehicle, even though no information indicated suspects had used a vehicle, where vehicle spotted minutes later and passenger resembled the description of the suspect].)

Here, even though officers did not observe a tattoo, Jauch testified that of the approximately 10 or so individuals outside the coffee shop, defendant was the only Hispanic individual wearing a black shirt and gray shorts. Considering also that Mario had reported the suspect could be found at the coffee shop and defendant failed to immediately respond to Jauch's commands, the officer reasonably believed criminal activity involving defendant was afoot, thereby justifying the decision to detain him.

We conclude the trial court's decision that Officer Jauch lawfully detained defendant is supported by substantial evidence that, considered in light of the totality of the circumstances, provided Officer Jauch with "specific articulable facts" demonstrating "some objective manifestation" that defendant was involved in criminal activity at the time of his detention. (*People v. Souza* (1994) 9 Cal.4th 224, 231.)

## D. Trial Court's Denial of Motion to Suppress

Defendant argues that the facts were insufficient to support the reasonable belief that he was armed and dangerous, necessary to support the patdown search and seizure of the wire cutters. Defendant also argues that Officer Jauch did not have probable cause to believe defendant committed a crime at the time he searched defendant and found the key chain (or double spring hook) and number stickers. The People disagree and argue that both the patdown search and the later search were lawful. The trial court found that the items seized would have been inevitably discovered and denied the motion to suppress

13.

the evidence. We agree that the items would have been inevitably discovered after defendant's arrest and search incident to his arrest and, therefore, find it unnecessary to address the lawfulness of the searches themselves. (See, e.g., *People v. Clark* (1993) 5 Cal.4th 950, 992–993 ["We need not address the merits of defendant's contentions relating to the existence or absence of probable cause … because we conclude the doctrine of inevitable discovery would validate the lower court's ruling in any event."], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

" 'Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means…. [T]he doctrine "is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 183–184; see *Nix v. Williams* (1984) 467 U.S. 431, 444 (*Nix*).)

"Instead, in order to justify application of the inevitable discovery exception, respondent must demonstrate … that, due to a separate line of investigation,[13] application of routine police procedures,[14] or some other circumstance, the [evidence] … would have been discovered by lawful means. The showing must be based not on speculation but on 'demonstrated historical facts capable of ready verification or

---

[13] *People v. Hughston* (2008) 168 Cal.App.4th 1062, 1072 (*Hughston*) cited *Nix*, *supra*, 467 U.S. at pages 449 through 450 as an example where a separate line of investigation established the inevitable discovery of the evidence.

[14] *Hughston* provided two examples where the application of routine police procedures established the inevitable discovery of the evidence. (*Hughston*, *supra*, 168 Cal.App.4th at pp. 1072–1073, citing *United States v. Andrade* (9th Cir.1986) 784 F.2d 1431, 1433 [narcotics in possession of lawfully arrested defendant inevitably would have been discovered through lawful inventory search] & *United States v. Martinez-Gallegos* (9th Cir.1987) 807 F.2d 868, 869–870 [fact that defendant previously had been deported inevitably would have been discovered through examination of his immigration file].)

14.

impeachment.' (*Nix*, *supra*, 467 U.S. at pp. 444–445, fn. 5.) The inevitable discovery exception requires the court ' "to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." ' " (*Hughston*, *supra*, 168 Cal.App.4th at p. 1072.)

"The prosecution must prove 'by a preponderance of the evidence that the information inevitably would have been discovered by lawful means.' ([Citation]; see *People v. Superior Court* (*Tunch*) (1978) 80 Cal.App.3d 665, 681 ['The test is not one of certainty, but rather of a reasonably strong probability'].) 'As this is essentially a question of fact, we must uphold the trial court's determination if supported by substantial evidence.' " (*People v. Fayed*, *supra*, 9 Cal.5th at p. 184, first bracketed insertion added.)

In this case, Mario called 911 to report that a suspect had threatened him and stolen items from the store. Officer Kidwell testified that when he arrived at the location, Mario pointed out defendant as the suspect while he was in the parking lot. Mario identified defendant as the individual who had taken items from the store and threatened to harm him. This evidence alone was enough to provide Kidwell probable cause to arrest defendant without reliance upon the items found in defendant's pockets during Jauch's searches. Defendant points out that the trial court relied upon " 'information received and the items found' " by Jauch in applying the inevitable discovery doctrine. We agree that our analysis of whether the evidence would have inevitably been discovered cannot rely upon the items that Jauch found through his searches. (See, e.g., *U.S. v. Boatwright* (9th Cir. 1987) 822 F.2d 862, 864–865.) We have not relied upon these items and still agree with the trial court's conclusion as to the applicability of the inevitable discovery doctrine and denial of defendant's motion to exclude the evidence.

Kidwell testified that, after Jauch's search, Kidwell searched defendant before placing him in his patrol car to ensure that defendant did not have any weapons or dangerous items during transport. Kidwell performed this search pursuant to standard

policy requiring such a search before placing any suspect in a patrol car. Even if Jauch had not patdown searched defendant or searched his pockets, Kidwell's search of defendant subsequent to arrest and prior to transport would have resulted in the seizure of the pliers, key chain, and number stickers that defendant had taken from the store.

Defendant argues that inevitable discovery is inapplicable to this case because while Kidwell obtained information establishing probable cause, Jauch's illegal detention of defendant was the only reason defendant was still in the parking lot when Kidwell arrested him. According to defendant, even Kidwell's discovery of the seized items relies upon the illegal detention and is not truly independent.[15] However, we have already concluded that defendant was lawfully detained. Given defendant's arrest would have occurred based upon Mario's statements to Kidwell, Kidwell would have inevitably discovered the items during a routine search of defendant pursuant to his arrest. Since this search took place even though Jauch had already searched defendant, the items seized from defendant would have inevitably been discovered.

We conclude substantial evidence supports the trial court's conclusion that the items taken from the store and found in defendant's pockets by Officer Jauch inevitably would have been discovered by Officer Kidwell when he searched defendant prior to transporting defendant in his patrol car.

## II. *The evidence that defendant used force or fear to take property from employees of the store was sufficient to support defendant's robbery conviction.*

Defendant argues the evidence was insufficient to demonstrate that he used force or fear to take, asport, or retain the stolen items. We disagree and conclude that the evidence was sufficient to support defendant's robbery conviction.

---

[15] The existence of a separate investigation is not the only way in which the prosecution may show the evidence would have been inevitably discovered by lawful means. (*U.S. v. Boatwright*, *supra*, 822 F.2d at p. 864 ["The existence of two independent investigations at the time of discovery is not, therefore, a necessary predicate to the inevitable discovery exception."].)

16.

## A.    Standard of Review and Law

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  We do not redetermine the weight of the evidence or the credibility of witnesses.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].)  We must accept logical inferences that the trier of fact might have drawn from the evidence although we would have concluded otherwise.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*Albillar*, at p. 60.)  "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*Young*, at p. 1181.)

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  Robbery is larceny with the aggravating circumstances that "the property is taken from the person or presence of another" and "is accomplished by the use of force or by putting the victim in fear of injury."  (*People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. 2.)  In California, "[t]he crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety."  (*People v. Estes* (1983) 147 Cal.App.3d 23, 28.)  It thus is robbery when the property was peacefully acquired, but force or fear was used to carry it away.  (*Gomez*, at pp. 255–256.)

17.

To establish that a robbery was committed by means of fear, the prosecution must present evidence that the victim was in fact afraid, and such fear allowed the crime to be accomplished. (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 612.) " 'The fear is sufficient if it facilitated the defendant's taking of the property. Thus, any intimidation, even without threats, may be sufficient.' " (*Ibid.*) The victim is not required to resist, and the victim's fear need not be extreme. (*People v. Morehead* (2011) 191 Cal.App.4th 765, 775.) All that is necessary is that the defendant demonstrates either conduct, words, or circumstances reasonably calculated to produce fear. (*Ibid.*)

## B.     Analysis

In this case, Mario testified that he approached defendant and asked him to leave the store. Defendant did not leave the store but rather, while threatening to harm Mario, took items from the aisles and placed them in his pockets. There is no evidence that Mario attempted to resist defendant's taking of the items, but Mario testified that he was frightened of defendant. Despite his fear, Mario followed defendant without attempting to retrieve the property and repeatedly asked defendant to leave. When defendant eventually did walk outside, he stayed in an area where merchandise was on display and Mario continued to follow him. Defendant then took a fighting stance and threatened to "kick [Mario's] ass," causing Mario to get out of defendant's way because he was afraid. Defendant took the items from the store without paying and was able to do so without Mario's interference because Mario feared defendant would hurt him. We conclude that the evidence was sufficient to prove that defendant took property from Mario's immediate presence, against his will, using fear to prevent Mario from resisting.

Defendant argues that Mario had been ordering defendant to leave the store from the outset of his encounter with defendant. While acknowledging that he did threaten Mario and Mario was afraid of him, defendant argues that there is no evidence this fear had any bearing on permitting defendant to retain possession of the stolen items. We disagree. We believe that the jury could have reasonably inferred from the evidence that

18.

Mario did not resist defendant taking the property or attempt to recover it from defendant because Mario was afraid that defendant would "kick [Mario's] ass," as threatened, if he interfered. We must accept this logical inference in weighing the sufficiency of the evidence. (*People v. Streeter*, *supra*, 54 Cal.4th at p. 241.)

Defendant appears to suggest fear was not used to take the property because defendant put the property into his own pocket, rather than demanding that Mario do so, citing *People v. Morehead*, *supra*, 191 Cal.App.4th at page 775. While in *Morehead* the defendant used demand notes when robbing three banks (*id.* at pp. 768–769), nothing in that opinion suggests that compelling a victim to comply with a demand is the only manner in which fear can be used to commit a robbery. To the contrary, robbery is committed where "the defendant used force or fear to take the property *or to prevent the person from resisting*." (*People v. Scott* (2009) 45 Cal.4th 743, 749, italics added, citing CALCRIM No. 1600;[16] see *People v. Wright* (1996) 52 Cal.App.4th 203, 210 [the element of fear can be committed by conduct that intimidates the victim to the extent it suspends his or her free exercise of will or resistance]; *People v. Welsh* (1936) 7 Cal.2d 209, 212 [robbery requires showing of force or victim's fear to resist]; *People v. Brew* (1991) 2 Cal.App.4th 99, 104 [sufficient evidence of fear where cashier in retail store allowed the defendant to take money from cash register drawer after he stood close to her, without barrier or counter between them]; *People v. Prieto* (1993) 15 Cal.App.4th 210, 215–216 [finding sufficient evidence of fear as to second woman where the defendant snatched both women's purses from lap of first woman in wheelchair, struggled with woman in wheelchair, and second woman observed the struggle].)

Defendant also argues that his threats to Mario just outside the store were not relevant as the robbery was completed because "[defendant] was already in a position of

---

[16] In this case, the trial court instructed the jury with CALCRIM No. 1600, regarding the use of force or fear: "Fifth, the defendant used force or fear to take the property *or to prevent the person from resisting*." (Italics added.)

relative safety." The evidence showed that defendant, while outside, was still in front of the store and in an area where merchandise was on display for customers and Mario was still following him. "A theft or robbery remains in progress until the perpetrator has reached a place of temporary safety. [Citation.] The scene of the crime is not such a location, at least as long as the victim remains at hand. (*People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375 ['Phrased otherwise, the robbery is not "over" until the victim has reached a place of temporary safety']; [citation].)" (*People v. Flynn* (2000) 77 Cal.App.4th 766, 772, second bracketed insertion added.) The jury could reasonably infer that defendant, knowing Mario had contacted the police, threatened Mario outside the store to facilitate his escape and prevent Mario from either following him or observing where he would go. (See *People v. Gomez*, *supra*, 43 Cal.4th at pp. 253, 265 [victim not present when property taken but the defendant used force when victim followed him, intending to help police but not intending to apprehend him].)

We conclude that the evidence was sufficient to support defendant's conviction of second degree robbery.

### III. *The trial court did not abuse its discretion in denying defendant's* Pitchess *motion.*

Before trial, defendant made a *Pitchess* motion requesting disclosure of Officer Kidwell's personnel records relevant to dishonesty and other misconduct. The trial court granted the motion for an in camera review as to any matters involving dishonesty. After reviewing the records, the court found no records required to be disclosed. We have reviewed the records and see no abuse of discretion.[17]

A trial court's decision on a *Pitchess* motion is reviewed under an abuse of discretion standard. (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.) The exercise of that discretion "must not be disturbed on appeal *except* on a showing that the court

---

[17] The People respond that review is an idle act inasmuch as Officer Kidwell did not testify at defendant's trial. Given that Officer Kidwell's veracity would be relevant to the trial court's decision on defendant's motion to suppress, we do not agree that review is an idle act.

exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) We review the record for "materials so clearly pertinent to the issues raised by the *Pitchess* discovery motion that failure to disclose them was an abuse of *Pitchess* discretion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.) The record of the trial court's in camera hearing is sealed, and appellate counsel are not allowed to see it. (See *People v. Hughes* (2002) 27 Cal.4th 287, 330.) Thus, on request, the appellate court must independently review the sealed record. (See *Prince*, at p. 1285.)

"A criminal defendant has a limited right to discovery of a peace officer's personnel records. [Citation.] Peace officer personnel records are confidential and can only be discovered pursuant to Evidence Code sections 1043 and 1045." (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 318.) "[O]n a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant. [Citation.] Good cause for discovery exists when the defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.] … If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' " (*People v. Gaines* (2009) 46 Cal.4th 172, 179, last bracketed insertion in original.)

We have reviewed Kidwell's personnel records and find no relevant information in them. We conclude the trial court did not abuse its discretion by deciding not to disclose any records.

## **DISPOSITION**

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

DETJEN, J.

FRANSON, J.