Filed 11/20/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>LUCION LEE EDWARD BANKS,<br><br>　　Defendant and Appellant. | 2d Crim. No.B312618<br>(Super. Ct. No. 18F-09531)<br>(San Luis Obispo County) |

　　The Chelsea King Child Predator Prevention Act of 2010 penalizes human trafficking of a minor. It targets a person who preys upon, and forces, a minor to engage in commercial sex acts for the person's financial benefit. The penalty for this crime is fifteen years to life imprisonment. That was the sentence imposed here.

　　Lucion Lee Edward Banks appeals from the judgment after a jury convicted him of human trafficking of a minor ("Doe") for a commercial sex act and found true the allegation that the offense involved force, fear, fraud, deceit, coercion, violence, duress,

menace, or threat of unlawful injury.  (Pen. Code, § 236.1, subd. (c)(2).)[1]

Appellant contends: (1) the trial court erred in denying his motion to suppress evidence obtained during a warrantless search of his vehicle, (2) he has standing to challenge the search of Doe's cell phone, (3) the evidence is insufficient that he used force or fear to induce Doe to engage in commercial sex, (4) the prosecutor committed misconduct during argument, (5) the trial court erred in failing to instruct on the lesser included offense of attempted pandering, and (6) the cumulative impact of the "errors" requires reversal.  We affirm.

*Factual and Procedural Background*

Doe was born in 2003.  She lived with her mother in Oakland.  Doe's mother was abusive toward her and when Doe was 10 years old, her mother "kicked her out of the house."  When Doe was 11 years old, she became a prostitute.  The Sacramento Sheriff's Department arrested Doe and returned her to her mother.  She was not welcome there and Doe returned to a life on the streets.

Doe continued to work as a prostitute.  She worked for her first pimp at the age of 12.  She left him when he became violent.  She worked for a second pimp but left him after he too, became violent.

In September 2018, Doe met appellant.  At that time, she had been working by herself as a "renegade," that is, a prostitute who works without a pimp.  Doe was 14 years old.  Appellant was 35 years old.  Doe trusted appellant and gave him her telephone number.  Later that same day, appellant picked Doe up in his Jaguar and took her shopping for boots.  As they were driving,

---

[1] All further statutory references are to the Penal Code.

Doe received a telephone call from a police officer. Appellant immediately changed Doe's phone number without her consent.

Doe began working as a prostitute for appellant that same day. Appellant set the rules that Doe was required to follow. He expected her to hold a door open for him. When she did not, appellant got mad and raised his hand like he was going to hit her. He also had rules regarding how Doe was to dress and wear her hair. He told Doe to wear different colored wigs every night, as well as revealing clothing, and high heel shoes. He told her to call him "Daddy." He controlled what she could and could not do, who she could speak to, when she worked, when she slept, and when she ate. He physically battered her on three occasions.

Appellant took Doe from city to city, using known areas of prostitution called "blades." He drove her to San Jose, Salinas, Oakland, San Francisco, Fairfield, Fresno, and Vallejo. Appellant did not tell Doe where they were going and she was not allowed to ask. She was also not allowed to take any pictures or post her location. Appellant dictated these rules to prevent any proof of prostitution and to avoid detection by police.

Doe worked as a prostitute every day for appellant. When they were not together, they communicated by cell phone and text messages. Many of their text messages referenced street locations and prices for "dates." One message from appellant's cell phone to Doe's cell phone stated, "Have faith in my pimpin bitch." There were also text messages that referred to appellant physically abusing Doe.

In early October 2018, appellant was driving through San Luis Obispo at approximately 1:40 a.m. Doe was also in the car. Officer Quenten Rouse of the San Luis Obispo Police Department conducted a traffic stop because appellant's vehicle did not have

proper license plates, and he was not wearing his seatbelt. Officer Rouse did not see any temporary DMV registration sticker on the front passenger window. Officer Rouse contacted appellant. Appellant explained that he did not have a driver's license, and instead, provided his I.D. card.

Officer Rouse observed an open container of marijuana in the center console of the front driver's seat and front passenger seat. This was a concern because marijuana must be stored in a sealed container inside a vehicle. Officer Rouse ran a records check on appellant. He was advised that appellant's license was suspended and there was a misdemeanor traffic warrant for his arrest.

Officer Rouse then contacted Doe, who was sitting in the front passenger seat. She appeared to be under the age of 18. Officer Rouse attempted to identify Doe because of her youth and the time of the night. Doe did not have any identification and twice provided a false name and date of birth. Officer Rouse suspected Doe may be a runaway or a reported missing person. He removed Doe from the vehicle and had her sit on the curb next to appellant. Officer Rouse continued to try to identify Doe. When Doe started to give him a different name, appellant said something to Doe under his breath that Officer Rouse could not hear. Doe provided a third name and date of birth that did not return a match.

Doe was wearing a "puffer-type" jacket. Officer Rouse asked Doe to open her jacket to check for weapons. He noticed that she was wearing a halter top that exposed her bare midriff and tight pants. Officer Rouse believed the clothing was inappropriate for the cold weather and was very revealing for someone of Doe's age. He searched the car and found wigs,

4

revealing clothing, approximately 25 condoms, feminine hygiene products, and receipts for a motel room in Tracy. When Officer Rouse searched Doe's purse, he found a condom that matched the brand of the condoms in the car. He also found an identification card that did not belong to Doe.

When Officer Rouse questioned appellant and Doe separately, their stories were drastically different. Appellant claimed to have only known Doe for a few days, but Doe said she had just met appellant. Appellant said he was headed to Los Angeles to sell his car, but later said he was headed to the Bay area to sell the car. Doe said they had come from Salinas and were heading back to the Bay area, which did not make sense because San Luis Obispo is to the south of Salinas.

Officer Rouse placed appellant under arrest for the outstanding warrant and driving with a suspended license. After appellant was removed from Doe's presence, she provided her true name and stated that she was 14 years old.

Officer Rouse believed appellant was engaging in human trafficking. He contacted his supervisor and requested Child Welfare Services to meet him at the police station. He secured both appellant's and Doe's cell phones, locked appellant's vehicle in the parking lot, took custody of Doe, and transported her to the police station.

At the police station, Officer Rouse continued to interview Doe. Based on his reasonable suspicion of trafficking a minor, he asked if there was going to be any messages on her cell phone about human trafficking or sex for money. Doe said there might be because "she let bitches use her phone." Doe consented to the search of her cell phone and signed a consent form. Officer Rouse searched Doe's cell phone and saw information that confirmed his

belief that appellant was involved in human trafficking or sex for money.

Officer Rouse identified appellant's phone number based on the phone number written on a "for sale" sign placed in the window of appellant's Jaguar, as well as the phone number he provided on the booking form to the county jail. Officer Rouse used Doe's cell phone to call the number and appellant's phone rang. Appellant's phone number was listed in Doe's contacts as "My Chocolate King." Based on his training and experience, Officer Rouse knew the term "king" was a street term for a pimp. Doe also repeatedly referred to appellant as "Daddy," a term commonly used by victims to their traffickers to establish an authoritative figure or a person of strength.

The text messages included comments from appellant about going "upside [Doe's] head" when she was "outta pocket," which Officer Rouse believed to be physical violence for not following appellant's rules.

The text messages also showed that appellant and Doe got into a fight when they were in San Francisco. Appellant was angry because he thought Doe had interfered with another prostitute who worked for him. He beat Doe as they were driving, then stopped at a gas station and told her to get out. She refused because she had no money, no identification, and had nowhere to go.

When Officer Rouse asked Doe if appellant was trafficking her or pimping her, she denied it. Doe provided Officer Rouse with the password to appellant's cell phone, which was "Pimp n asss." When Officer Rouse typed the password into appellant's cell phone, the phone unlocked. Officer Rouse did not search

appellant's phone at that time.  It was subsequently searched pursuant to a warrant.

*Lawful Search of Appellant's Vehicle*

Appellant contends the trial court erred in denying his motion to suppress the "fruits of the warrantless search" of the vehicle.

Fourth Amendment jurisprudence is well known.  (See, e.g., *Katz v. United States* (1967) 389 U.S. 347, 357; *Arizona v. Gant* (2009) 556 U.S. 332, 338.)  Well-settled rules govern our review. (*People v. Quick* (2016) 5 Cal.App.5th 1006, 1010; *People v. Sims* (2021) 59 Cal.App.5th 943, 950.)  We will affirm the trial court's ruling if correct on any theory of law applicable to the case, even if the reasons differ from those given by the trial court.  (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.)

Appellant contends the decision to tow and then search the vehicle was "obviously 'motivated by an investigatory purpose.'" The evidence demonstrates otherwise.  Because we conclude the search was justified by the inevitable discovery doctrine, we need not address the other exceptions to the warrant requirement.

The inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence if the prosecution can establish by a preponderance of the evidence that the information would have been inevitably discovered by lawful means, such as routine police procedures.  (*Nix v. Williams* (1984) 467 U.S. 431, 444; *People v. Hughston* (2008) 168 Cal.App.4th 1062, 1071-1072.)

Officer Rouse lawfully stopped appellant's car.  Appellant pulled into a private parking lot.  He did not have a valid driver's license.  The San Luis Obispo Police Department has a policy regarding inventory searches "[t]o protect the department as well

as the defendant or owner of the vehicle in the event that there's property – highly valuable property inside the vehicle, large amounts of cash, things of that nature. In addition, the inventory search will document any damage to the vehicle to protect the tow company in the event of civil litigation . . . [a]s well as document everything inside the vehicle."

Officer Rouse suspected the vehicle may have been stolen because it was an older vehicle with paper plates, there was no vehicle registration in the window, and appellant failed to produce proof of ownership. "Police officers may exercise discretion in determining whether impounding a vehicle serves their community caretaking function, 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.' [Citation]." (*People v. Torres* (2010) 188 Cal.App.4th 775, 787; *People v. Williams* (2006) 145 Cal.App.4th 756, 759-763.) Based on these facts, the trial court correctly concluded the evidence would have been inevitably discovered pursuant to a lawful inventory search.

*Consensual Search of Victim's Cell Phone*

Appellant contends he has standing to challenge the search of Doe's cell phone, which he claims was accomplished through coercion. He concedes that the trial court "correctly applied third-party standing law in ruling on the suppression motion." Nevertheless, he urges this court to reconsider the doctrine and conclude that he has a reasonable expectation of privacy in the data transmitted to a third party because of the "complex, detailed and private nature of smartphone communication."

The answer is, no. We decline the invitation to depart from this well-settled doctrine. (See, e.g., *People v. Satz* (1998) 61

8

Cal.App.4th 322, 325.)  We also observe that the trial court factually found that "there was no coercion of any sort."

*Sufficiency of the Evidence*

Appellant contends the evidence was insufficient that he used force or fear to induce Doe to engage in commercial sex, or that there was "any link" between his use of force or fear and Doe's engaging in commercial sex.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence – that is, evidence that is reasonable, credible, and of solid value – supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

Appellant contends the evidence is insufficient as to the "forcible" trafficking conviction.  He argues that it only shows "that a prostitute experiences a *climate* or a *relationship* in which violence sometimes occurs."  He adds that the evidence shows that Doe was a prostitute "long before she ever met" him.

9

Sometimes she used a pimp, sometimes she acted as a "'renegade.'" She left prior pimps who treated her poorly. And although there was evidence that appellant used force against Doe "on certain occasions," he argues that the evidence is insufficient to prove that the use of force or fear "was a factor that 'caused' or 'induced' or 'persuaded' Doe to engage in any act of commercial sex."

The People correctly contend this was a "textbook case of a perpetrator using both force and fear to induce a 14-year-old victim to engage in commercial sex."

The prosecution presented expert testimony describing the nature of human trafficking. Timothy Bergquist of the Alameda County District Attorney's Office explained that even if a victim enters the lifestyle willingly, they can still be a victim of trafficking if they are kept in the lifestyle through violence, force, or fear, and other such factors. This is especially true for younger victims who are initially "seduced" by the trafficker, but the relationship quickly becomes violent or there are threats or manipulation to keep the victim in prostitution. Bergquist explained that the pimp will use common techniques to break down the victim, such as physical violence, threats, psychological manipulation, physical, mental, and economic abuse, in essence, stripping the victim of everything down to their clothing. In so doing, the pimp steps into the role of being the person "in total control" of the victim emotionally, physically, economically so that the victim is "absolutle[ly] dependent on the trafficker."

Bergquist also testified that another way in which a trafficker exerts control over the victim is through constant communication on cell phones. The trafficker will also use social media to set up "dates" for the victim and will travel from city to

10

city with the victim to avoid police detection and to keep the victim disoriented and dependent upon the trafficker. There is also the added benefit of being the "new face" in the area.

Doe testified that after appellant became her pimp, he controlled what she wore, who she talked to, how long she worked, and when she slept. She even communicated to him when she had to use the bathroom. He demanded all of the money she earned on her "dates."

Appellant kept Doe isolated and completely dependent upon him. He changed her cell phone number without her knowledge or consent, drove her from city to city, where he would put her on the "blade" to work. He did not tell her where he was taking her. When they arrived, she felt "lost" and had to rely on appellant to figure out where she was going. This is consistent with the trafficker's efforts to exert "total control" over the victim.

There was also evidence that appellant used psychological manipulation, as well as physical violence to maintain control over Doe. For example, she testified that appellant would get mad at her and say things to hurt her feelings, but then he would be nice to her and make her feel special. Doe testified that appellant would beat her if she broke the rules, or if she made him mad, or "just because."

The prosecution also relied on the text messages between appellant and Doe to establish that he trafficked Doe and did so through force or fear. In one message, Doe told appellant, "Why daddy. u the one that had took me off of international and showed me that it was more places then just international and that I am worth way more then just 40 dollars . . . ." In another text Doe sent to appellant, she said, "Daddy on date for 50," to which appellant replied, "Bring me my money when u done." The

11

text messages also demonstrate that appellant used physical violence when Doe did not abide by his rules.  For example, Doe wrote, "Mmmmm at least I dont gotta worry about nobody hitting me tonight."  Appellant replied, "Bitch lmpao [laughing my pimp ass off] bitch u act like I jus wanna hit u."  Doe responded, "U do." "That is really what u wanna do."  Appellant replied, "Bitch I don't until u get outta pocket."

Sufficient evidence supports the jury's finding that appellant used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury as set forth in section 236.1, subdivision (c)(2).

*Alleged Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct by repeatedly suggesting that sexual trafficking merely requires "encouraging" prostitution, that the crime of trafficking is already "done" if a pimp recruits an active prostitute to work for him, and that encouragement and persuasion are "interchangeable."  We conclude the claims are both forfeited and without merit.

The standard governing review of prosecutorial misconduct claims is well-settled.  It requires reversal only when a prosecutor uses "'deceptive or reprehensible methods [to attempt] to persuade either the [trial] court or the jury' [citation] and "'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'" [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request and admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct."  (*People v. Price* (1991) 1 Cal.4th 324, 447.)

Here, appellant's trial counsel objected to the prosecutor's misstatement of the law when he, on more than one occasion, used the word "encourage" to describe the legal standard to establish trafficking.  The objections were sustained but counsel did not ask that the jury be admonished to disregard the prosecutor's misstatement of the law.  Even if this claim had been properly preserved for review, we would nevertheless reject it on the merits.

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.)  But those misstatements must be evaluated "'[i]n the context of the whole argument and the instructions' [citation], [and the appellant must show] there was a 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

Section 236.1, subdivision (c) provides, "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [certain enumerated crimes] is guilty of human trafficking."

The prosecutor repeatedly used the word "encourage" to describe appellant's conduct as sufficient for a violation of section 236.1, subdivision (c)(2).  This was erroneous but trial counsel did

13

not request an admonition. The trial court sustained these objections and the prosecutor corrected himself each time. It is not likely that the jury applied the prosecutor's misstatements in an objectionable fashion because the trial court instructed the jury to "follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." We presume the jury followed the trial court's instructions, rather than any conflicting statements by counsel. (*Centeno*, *supra*, 60 Cal.4th at p. 676; *People v. Meneses* (2019) 41 Cal.App.5th 63, 75.)

*Lesser Included Offense Instruction*

Appellant contends the trial court erred in "failing" to sua sponte instruct the jury on the lesser included offense of attempted pandering of a minor in violation of section 266i, subdivision (b). We disagree. There was no "failure" here.

The trial court was not required to instruct sua sponte on this lesser included offense. "[T]he existence of '*any* evidence, no matter how weak,' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved of on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237; *People v. DePriest* (2007) 42 Cal.4th 1, 50.)

We independently review the substantiality of evidence for these purposes and do so by viewing it in the light most favorable

to the defendant.  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

CALCRIM No. 1151, sets forth the elements of the offense of pandering (§ 266i).  The pattern instruction provides, in relevant part: To prove that the defendant is guilty of pandering, the People must prove that the defendant successfully (1) (persuaded/procured) a person to become a prostitute, (2) intended to influence the person to be a prostitute, and (3) the person was a minor (16 years old or older/under the age of 16) at the time the defendant acted.  Appellant was charged with trafficking a minor in violation of section 236.1, subdivision (c)(2).  The jury was instructed pursuant to CALCRIM No. 1244, which provides in relevant part:  To prove the defendant is guilty of this crime, the People must prove (1) the defendant caused or induced or persuaded or attempted to cause or induce or persuade another person to engage in a commercial sex act, (2) when the defendant acted, he intended to commit pimping (§ 266h), and (3) when the defendant did so, the other person was under 18 years of age.

Here, there is no substantial evidence that appellant was guilty of the lesser offense of attempted pandering but not the greater offense of trafficking of a minor.  (See *People v. Campbell* (2020) 51 Cal.App.5th 463, 495-496, 500-502.)  The evidence, which was credited by the jury, is overwhelming as to the charged offense.

*Cumulative Error*

Appellant contends the cumulative impact of the alleged errors requires reversal.  Because there was no error, "there is nothing to cumulate and hence there can be no cumulative prejudice." (*People v. Grimes* (2016) 1 Cal.5th 698, 737.)

15

*Disposition*

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION</u>.


YEGAN, J.

We concur:


GILBERT, P. J.


BALTODANO, J.

Barry T. LaBarbera, Judge
Superior Court County of San Luis Obispo
_____

Alex Coolman, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.